**MORRISON et al. v. HELLER et al.**
No. 9850.

United States Court of Appeals
Third Circuit.

Argued Oct. 7, 1949.

Decided June 15, 1950.

guidance in a labyrinth of uncoordinated and extraneous data. The Trial Judge was constantly called upon to keep out irrelevant and duplicatory material. However, he gave plaintiffs full liberty and encouragement to develop their case.

Isidore Kay, New York City, pro se.

Norbury C. Murray, Newark, N. J., for appellee.

Before McLAUGHLIN and O'CONNELL, Circuit Judges, and FEE, District Judge.

JAMES ALGER FEE, District Judge.

This is an action brought on a claim by Olyve H. Morrison against Paul Heller, Walter M. Heller and Heller Brothers Company, Arthur H. Hunter, Heller-Hunter Steel Company and Lebanon Steel & Iron Corporation. Isidore Kay is the assignee of a portion of the Morrison claim and a co-plaintiff. Morrison, an osteopath, is the husband of Mrs. Morrison, plaintiff, and is the actor in this drama where her money was loaned.[1] Granger is an accountant and an intimate of Morrison, with whom the action starts.

The complaint was drafted by Kay, who is a lawyer who had not practiced for thirty years. Kay's own analysis of this prolix document is the only possible guide to the intention of the claims. He says the first cause of action is for money had and received, the second for fraud and deceit with a claim for punitive damages, the third for accounting and specific delivery of shares of stock, which it is claimed defendants agreed to issue to plaintiff, or for damages, the fourth charges conspiracy of the Hellers and Hunter to do the acts previously enumerated, and the fifth is a reiteration and summary of the preceding charges. The answer may be characterized as a general denial. Indeed, it is difficult to understand how any other defense would be possible. No pretrial order was drawn. At the trial a confused mass of evidence, oral and documentary, was introduced. Since there were few intelligible issues, all were without

The burden of proof was upon the plaintiffs. Neither the Trial Court nor this Court has any responsibility to require the record to be made fuller than it is, to require other witnesses to be produced nor to see that the case is skillfully presented. Upon the first and only clear cut count for money had and received, plaintiffs proved explicitly and beyond cavil that Morrison advanced on loan to Hunter $10,160.00, which has never been repaid. The evidence just as clearly showed that the Hellers, the only defendants concerned in this appeal, did not receive a single cent of this money. In an astounding denouement, after all this had been conclusively established, plaintiffs took a voluntary dismissal on the first count, not only as to the Hellers but as to Hunter, who unquestionably owed the money and was the defendant with whom the Hellers were jointly charged of fraud and conspiracy.

The Trial Judge seems to have rightly considered this a highly pertinent circumstance. After the close of all the evidence and after all parties had been heard, the Court directed a verdict against plaintiffs on the four counts as to the Hellers, appellees here. Thereupon, it is significant that plaintiffs requested and were allowed a voluntary dismissal against Hunter and the remaining defendants as to each of these counts.

The motion of appellants made on appeal to bring in additional documents, which was reserved, is now denied, and these exhibits are stricken from the record. It should suffice to say that these documents relate to a transaction which occurred over two years after this case was pending upon appeal. These documents were therefore not a part of the record upon which the Trial Judge acted in directing a verdict. The introduction of this

---

1. The name "Morrison" will be used, since the actions of Dr. Morrison are the basis upon which the claim is laid, and Mrs. Morrison had but little part in the matter although she is the actual plaintiff.

evidence would make this a complete new trial. If this Court had competence to receive such evidence, it should likewise have the power to return a verdict and enter judgment thereon. Litigation would otherwise be interminable. This maneuver seems to be an attempt to bring before this Court the fact that the Hellers paid $2,000.00 to settle an action brought by the Trustee in Bankruptcy of Hunter against the Hellers. This record discloses that Hunter had obtained some contracts from the Government for the Hellers, but the question here is not whether the Hellers owed Hunter anything, but whether the Hellers owed Morrison anything. This maneuver further characterizes the present action as what is vulgarly called a "strike suit." The learned Trial Judge apparently believed this when all the evidence was in.

The course of this case on appeal is another indication of the same motivation. The notice of appeal was filed February 14, 1947. The appeal lay dormant over two years without action. On April 18, 1949, the Hellers, stung by this apathy, moved to dismiss the appeal, instead of buttering the fingers of Kay and Morrison. According to the evidence here, the Hellers had tried the latter path on another claim assigned to Kay and out of which these two apparently received the proceeds. Out of extreme fairness, this Court permitted the filing of the records and briefs by appellant after the accumulation of over two and one-half years had been dusted off the notice of appeal.

After reviewing the record with utmost care—a barren labor—we are of opinion that the failure to proceed with the appeal should not have been forgiven. The deliberate noncompliance with the rules of appeal warrants dismissal.

Our above view is fortified by the fact that the record reveals no substance to appellants' contentions.

The Hellers, through Heller Brothers Company, were the manufacturers of steel tool products. In order to obtain the benefits of government contracts for manufacture of steel products, which began to bulk large at the time owing to the commencement of war in Europe and preparations here, the Hellers entered into a joint venture with Hunter. They agreed to pay Hunter one-half of the net profits realized by Heller Brothers Company from orders to be procured by Hunter from customers produced by him. The plant of Heller Brothers Company was to be expanded to take care of these anticipated orders by means of government financing of the "Diston" type procured by Hunter as a condition precedent. Under his profit sharing agreement, Hunter was to finance the performance of his obligations under the agreement and was to form a corporation and assign to it one-half of the anticipated profits for the purpose of manufacturing gun-type steel for exclusive sale to Heller Brothers Company, which had no steel manufacturing adjunct to its plant. The company thus to be formed was to be called Heller-Hunter Steel Company. The manufacturing operations and executive costs were to be divided between Heller Brothers Company and the new enterprise. Half of the proceeds of this operation were then to go to Hunter and half to the Hellers. However, this latter corporation could not operate until financing had been secured. Hunter was to obtain a United States Government loan for $500,000.00 for Heller-Hunter Steel Company, and he believed this to be secure because of the Heller backing. For the purpose of obtaining loans and orders, Hunter was made one of the executive personnel of Heller Brothers Company and was so accredited to the Government. On one occasion at least, he was referred to as one of the Hellers' steel men. There were regular conversations between the Hellers and Hunter regarding the progress of the loans to be obtained from the Government and orders which he also expected to obtain. Unquestionably, until the end of the relationship, they believed him reliable. They did advance him considerable sums as expenses while he was attempting to obtain orders and finances from the United States, notwithstanding he had assumed this obligation as a part of his contribution to the joint venture. The result of Hunter's efforts, as far as the joint venture was

concerned, was nil. He did obtain some orders from the Government. He made an assignment of one-half of the profits which he expected to realize therefrom to the Heller-Hunter Steel Company, which was incorporated but which was probably never organized and certainly issued no stock. The government financing was not obtained for Heller Brothers Company or for Heller-Hunter Steel Company or, in a later stage, for the Lebanon Steel & Iron Corporation. Neither the Heller-Hunter Steel Company nor the Lebanon Steel & Iron Corporation operated or manufactured any steel from which there could be any profit to be divided with them. The stock in either of the corporations, if it had been issued, was of no value. Since, according to the account filed, there were no profits, the Hellers owed Hunter nothing as his share of the joint venture. It is possible that they may have had some obligation to him for the orders which he obtained from the Government, but that is another lawsuit. Hunter eventually went into bankruptcy, and the last part of the dealings between the Hellers and him was carried on after that time but without the Hellers' knowledge that he had been adjudicated. This is the full story of the joint venture of the Hellers and Hunter.

Wonderment may be expressed as to how any basis could be laid for a claim against the Hellers by Morrison. Some further facts may indicate the theories upon which a connection is sought to be established.

Granger, the accountant friend of Morrison, met Hunter by chance in New York. Granger was so taken with the glowing accounts of Hunter's operations and dreams that he offered to put Hunter in touch with Morrison, who was looking for investments for Mrs. Morrison's money. Through this liaison Morrison met Hunter, who dramatized his connection with the Hellers and offered to take Morrison in on Hunter's share of the venture. Thereafter, Morrison sent Granger to see the Hellers, to check up on Hunter, and to discover whether he had any connection with them. This incident is the sole precaution which Morrison used. The conversation of Granger with Paul Heller is the sole basis upon which any claim could stand against the Hellers. It is perfectly clear in the record that the Hellers were not attempting to sell Granger or Morrison anything. They did not seek the connection, nor did they profit by it. Morrison did not meet or receive any direct communication with the Hellers until the incident of the purchase of the Lebanon Steel & Iron Corporation on June 23, 1942. At that time, Morrison asked nothing about the matters upon which these charges are founded. This was the last time that he ever had direct communication with any of the Hellers.

The theory that any of the Hellers received any of the money which Morrison advanced to Hunter was abandoned with the voluntary dismissal of the first count above noted. Analysis of the pleadings and evidence indicates several tentative theories which might have been developed out of the confused mass. First, there might have been some contract of joint venture with Morrison, whereby the Hellers were bound to account to plaintiffs or were bound specifically to perform by turning over certain shares of stock. Second, it might have been possible that Hunter was authorized by the Hellers to make representations to Morrison. Third, it might have been possible that the Hellers made representations to Morrison, intending them to be relied upon, which were false and which were relied upon with resultant damage.

As to the first proposition, there was no proof of any contract or agreement between the Hellers and plaintiffs. Dr. Morrison did not himself meet any of the Hellers until June, 1942. Granger, who talked to Paul Heller as above noted, did not contend that any agreement was made between them for participation of Morrison or that any such agreement was contemplated by either Morrison or Granger at the time. From the report of the conversation, Heller certainly was not intending to bind himself or anyone to a contract. The contract was between Morrison and Hunter. The consideration for the money which Morrison advanced to

Hunter was to be the issue of stock in the corporations and dividends resulting from the assignment by Hunter to the corporation of fifty per cent of the profits derived by the Heller Brothers plant, expanded by "Diston" financing procured by Hunter. To Morrison's knowledge, all this depended upon Hunter personally and not upon the Hellers. Although Heller-Hunter Steel Company was formally incorporated, it was never legally organized and had no stock. Hunter did not carry out his obligation. He did not obtain the "Diston" financing. He did not obtain financing for Heller-Hunter Steel Company. Finally, although he obtained orders for the Hellers, owing to his default in part, there was no profit. The assignment to the Heller-Hunter Steel Company was a vain thing which gave no rights to Morrison. The other possibility of a claim of contract was the meeting of June 23, 1942. On that occasion, Hunter told the Hellers of a meeting to be held at the office of the Ordinance Division of the War Department, without disclosing the purpose. At that place, an army major gave a super-heated sales talk to the effect that the Lebanon Steel & Iron Corporation properties were about to be seized for the Navy, and that they should be bought for $500,000.00 by making a down payment of $10,000.00, and that the remainder of the financing would be furnished by the United States. That afternoon the session was continued, and Hunter or someone with his knowledge asked Morrison to attend without telling him of the purpose. He came. The proposition was renewed. In the midst of some embarrassment, Paul Heller said he would loan $5,000.00 to Hunter, if someone else would advance the balance. Thereupon, Morrison said he would put up the other $5,000.00. Neither the Hellers nor Morrison knew that Hunter had just previously gone into bankruptcy.

The contract of sale for Lebanon Steel & Iron Corporation was executed. But the United States did not finance the plant. The whole sum thus put up was lost. The Hellers sustained other losses in connection with this plant because of their reliance upon Hunter, but it is clear there was no contract between Morrison and the Hellers. The Hellers did enter into an agreement with the Lebanon Steel & Iron Corporation to purchase its output of alloy steel at market prices, but the company never operated.

The most significant fact is that thereafter on September 5, 1942, Hunter entered into an agreement with Morrison without the knowledge of the Hellers, whereby Hunter agreed to give Morrison one-half of whatever Hunter should receive from Lebanon Steel & Iron Corporation. This agreement refers to the transaction above described as "our joint purchase of the Lebanon plant" and characterizes this as "pooling our interests to our mutual benefit."

The theory that there was any contract between Morrison and the Hellers fails. Therefore, no accounting, allocation and delivery of stock, or damages for breach can be predicated upon any theory of contract.

■ Inquiries are now made as to fraud and deceit. Here there are two possible branches. One query is as to the authority of Hunter to make representations binding upon the Hellers; the second is as to representation actually made by the Hellers themselves. As to the first, the record shows that Hunter was one of the executive personnel of Heller Brothers Company, and there is testimony that he was represented by Paul Heller to be an officer thereof and that he was held out to the Government as one of the steel men of the company. There is evidence that he was empowered to solicit orders from the Government, but there is no scintilla of evidence anywhere that he was empowered to or held out to make representation that the Hellers would pay over large sums of money to Heller-Hunter Steel Company, where the conditions precedent were never fulfilled. There is no basis of liability here.

■ As to direct representations, the Granger conversation indicates the only basis in evidence. Paul Heller was the interlocutor speaking for the Hellers. Granger said Morrison wanted information "that might assist him in reaching a de-

termination regarding negotiations that were in progress between Mr. Hunter and himself." Paul Heller agreed that they and Hunter were "in a joint venture to handle war contracts" and to acquire a plant named Heller-Hunter Steel Company "manufacturing gun-type steel" for Hellers' use, which corporation "owned valuable real estate at Union Beach, New Jersey," and was "to receive a loan of $500,000 from the United States Government for operating purposes and for the acquisition of plant." Heller said Hunter was one of the executive personnel of Heller Brothers Company, whom he had known for "many years," "he is a steel man and fully reliable," that Heller had "the utmost confidence in him and you may say to Dr. Morrison that in my opinion he may put reliance in Mr. Hunter and his statements." Granger then testified, "And Mr. Heller added, 'Mr. Hunter informed me that he invited Dr. Morrison to come into our venture.'" This is uncorroborated testimony as to an oral conversation given by a vitally interested party five years after the event and denied in all criminating particulars by Heller. It should be submitted to a jury if material. It is, however, immaterial because, even if true, it raises no inference of fraud. Heller did not send for Morrison or seek the interview. He knew Hunter was attempting to finance his share of the joint enterprise, and knew he expected to obtain some funds from some source. Paul Heller spoke exactly as to the joint venture and its purposes. He gave his estimate of Hunter at the time, undoubtedly in good faith. He expressed his belief that the corporation would receive government finances. A representation as to a future event is justified by a real belief that it will come about. There was only one statement now proven untrue. The corporation held no real estate in New Jersey or elsewhere, but this representation was not then and is not now material.

This record makes it perfectly apparent why no action was taken during the years while the appeal lay dormant. Dr. Morrison was not sought out by either Hunter or the Hellers or anyone on their behalf, nor was he led astray by the Hellers. Instead, he proposed all these measures himself and voluntarily lent Hunter the money.

 Fraud must be established by clear and convincing proof. Heller was under no duty to warn Morrison that a business enterprise might not be consummated for want of financing or might fail. Most bankers would be under terrific liability if they were held to have guaranteed a client's board bill simply because they represented that the bank had deposits of his and had loaned him money, that he expected a loan from the Government, and that the bank believed he could be relied upon.

There was no evidence of conspiracy. The Hellers backed their reliance upon Hunter and suffered losses on their own account. The learned Trial Judge was therefore correct and the judgment might well be affirmed. But, as we have pointed out above, the order permitting the appeal to proceed after the lapse of time was improvident. It will be set aside and the appeal dismissed.

Judge O'CONNELL heard the argument and participated in the consideration of this case but died before the opinion was filed.