John N. WITTEKAMP,

v.

GULF & WESTERN, INC.; Gulf & Western Industries, Inc.; Gulf & Western Manufacturing Co.; and Wickes Manufacturing

John N. Wittekamp, Appellant.

No. 92–3428.

United States Court of Appeals, Third Circuit.

Argued March 2, 1993.

Decided April 22, 1993.

Louis M. Tarasi, Jr. (Argued), Joseph J. Hinchliffe, Tarasi & Johnson, Pittsburgh, PA, for appellant.

Michael A. Cardozo (Argued), Marc J. Goldstein, Adrienne B. Koch, Proskauer Rose Goetz & Mendelsohn, New York City, H. Woodruff Turner, Scott S. Small, Kirkpatrick & Lockhart, Pittsburgh, PA, for appellees.

BEFORE: BECKER and GREENBERG, Circuit Judges, and ROBINSON, District Judge.*

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. BACKGROUND

Appellant John N. Wittekamp brought this suit in state court to recover damages for alleged misrepresentations by appellees Gulf & Western, Inc., Gulf & Western Industries, Inc., Gulf & Western Manufacturing Co., and Wickes Manufacturing (collectively referred to as Gulf & Western), arising from his employment by and subsequent purchase of one of Gulf & Western's corporate divisions. Gulf & Western timely removed the matter to the district court on the basis of diversity of citizenship. Wittekamp now appeals from a judgment of July 24, 1992, in favor of Gulf & Western entered in part on its motion for a judgment and in part on a jury verdict. We will affirm.[1]

The relevant facts as developed at trial are as follows. In 1982, Wittekamp relinquished his position as Chief Executive Officer and Chairman of the Board of a fire truck manufacturing company in western New York to become President of the Macintosh–Hemphill division of Gulf & Western (Mac–Hemp). Subsequently, in April 1983, representatives of Gulf & Western contacted him about purchasing Mac–Hemp. Wittekamp and Edward B. Hirschberg, one of Gulf & Western's Vice–Presidents, then began negotiations for this purchase. On October 17, 1983, Wittekamp acquired Mac–Hemp in a leveraged buyout through his solely owned corporation that he formed for the transaction. Under the purchase agreement, Wittekamp assumed certain obligations of Gulf & Western in-

---

* Honorable Sue L. Robinson, United States District Judge for the District of Delaware, sitting by designation.

1. We have jurisdiction pursuant to 28 U.S.C. § 1291. The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Wittekamp is a citizen of Pennsylvania. Gulf &

Western Industries, Inc., is a Delaware Corporation with its principal place of business in New York. Wickes Manufacturing, Gulf & Western, Inc., and Gulf & Western Manufacturing Co. are all Delaware corporations having their principal places of business in Michigan.

cluding the then-current collective bargaining agreements with the United Steelworkers of America (USW), which required Mac–Hemp to provide group health insurance for retired employees. At the closing, a Memorandum of Understanding between Wittekamp and the USW confirmed this transfer of the obligation for the group health insurance.

From 1984 to 1987, following Wittekamp's purchase of Mac–Hemp, its financial position grew progressively worse. In early 1987, to stem his losses, Wittekamp gave notice to the retired employees that their group health insurance was being terminated. On March 22, 1987, the retirees commenced a putative class action in the United States District Court for the Western District of Pennsylvania against Mac–Hemp and Gulf & Western seeking restoration of their group health insurance, or damages for its wrongful cancellation in violation of the collective bargaining agreement (*Wernert* case). Gulf & Western partially settled the *Wernert* case by agreeing to share the cost of group insurance with employees who retired before the sale of Mac–Hemp to Wittekamp. Mac–Hemp subsequently filed for bankruptcy in July 1987, and thus the *Wernert* case was stayed as to it. Insofar as we are aware, no court has determined whether Mac–Hemp could terminate the benefits.[2]

Wittekamp, who perceived that he had been injured by misrepresentations made by Gulf & Western, then commenced this action in the Court of Common Pleas of Allegheny County, Pennsylvania. On March 8, 1989, Gulf & Western removed the case to the United States District Court for the Western District of Pennsylvania.

In his complaint, Wittekamp alleged that Gulf & Western failed to disclose Mac–Hemp's precarious financial condition before hiring him. He further contended that he acquired Mac–Hemp in the belief that he could cancel the group health insurance for retired steelworkers when the USW collective bargaining agreement expired, that Gulf & Western knowingly failed to tell him at the time of the purchase that such benefits were not cancellable because they had already had vested, and that but for his inability to terminate these benefits without controversy, he would not have suffered the consequences of Mac–Hemp's 1987 business failure and bankruptcy.[3] Accordingly, his complaint asserted two distinct causes of actions for fraud,[4] one based upon Gulf & Western's fraudulently inducing him to leave his previous position to join Mac–Hemp and one based on Gulf & Western's persuading him to buy Mac–Hemp once he became its president.[5]

At trial, Wittekamp focused his theory of fraud on several documents. The first was Paragraph 6M and Exhibit K of the October 17, 1983 Purchase Agreement, which purported to provide a "true and complete list" of all the contractual obligations exceeding $5,000 which Wittekamp would have to assume upon his purchase of Mac–Hemp. Wittekamp argued that this list misled him because it did not mention the group health plan for the retirees—an

---

**2.** For purposes of the instant litigation, the district court assumed the retiree medical benefits had vested, based on a concession to that effect by Gulf & Western.

**3.** The complaint also included a claim for breach of contract relating to a July 5, 1983 letter of intent preceding the sale, but Wittekamp withdrew this claim on the first day of trial.

**4.** Wittekamp's fraud theory evidently rests on his reading of case law concerning an employer's right to terminate collectively-bargained retirement benefits. Some cases have held that if the collective bargaining agreement did not clearly reflect the parties' intentions concerning duration of benefits, evidence of past conduct in performing the collective bargaining agreement could indicate that management understood the benefits to outlast the agreement's term. *See, e.g., Bower v. Bunker Hill Co.,* 725 F.2d 1221 (9th Cir.1984). In view of our conclusion that Wittekamp did not adduce sufficient evidence to withstand the motion for judgment, we do not need to address this point.

**5.** Following discovery, both parties moved for summary judgment, but the district court denied the motions on the ground that there were disputed questions of material fact as to whether Gulf & Western knew that the health insurance benefits had vested and whether Wittekamp was operating on the false assumption that they had not. *See Wittekamp v. Gulf & Western, Inc.,* 788 F.Supp. 246 (W.D.Pa.1992).

omission which, he claimed, led him to believe that these benefits had not vested and were terminable. Gulf & Western responded that Exhibit K listed the group health plan under Items 4(A) and 4(b). Gulf & Western also contended that inasmuch as Exhibit K was only a list, the omission of an indication of whether the retirees' group health benefits were vested was not material to its purpose.

Wittekamp also introduced Exhibit 98, a booklet entitled "Program of Hospital and Physicians Services Benefits for Eligible Pensioners and Surviving Spouses Not Eligible for Medicare." The booklet, which bore an "effective date" of November 1, 1975, was annexed to a December 2, 1975 letter from Mac–Hemp's Supervisor of Personnel Administration to a USW insurance department employee. It described health insurance benefits covering persons who had not reached the age of Medicare eligibility. More importantly, Exhibit 98 included a two-page unsigned document entitled "Pensioners and Surviving Spouses Health Insurance Agreement," which stated that the insurance coverage would not terminate for individuals who retired while the agreement was in effect and who were not yet eligible for Medicare. Wittekamp pointed to Exhibit 98 as evidence that retiree group health insurance at Mac–Hemp already had vested when he purchased Mac–Hemp in October 1983 and that Gulf & Western knew this. Because Gulf & Western had not shown the document to Wittekamp prior to the discovery in this action, he contended that in 1983 Gulf & Western deliberately had hidden it from him to prevent him from learning that the benefits had vested.

Five Gulf & Western officers and attorneys who took part in the Mac–Hemp sale testified that they never saw Exhibit 98 prior to the 1983 sale, or even after that, until it was located in Gulf & Western's files during discovery in this action. They also testified that the USW and Mac–Hemp never executed the agreement within Exhibit 98. Indeed, Wittekamp presented no evidence that the document contained in Exhibit 98 ever became a binding contract between the USW and Gulf & Western.

Wittekamp produced Exhibit 621 as his third item of documentary evidence. This exhibit was an internal Gulf & Western accounting report prepared before the sale containing the statement that "[b]uyer will assume the union contract, including retiree medical of approximately $11,100,[000]." Wittekamp argued that this $11.1 million figure indicated that the retiree group health insurance was not cancellable, because $11.1 million far exceeded the $300,-000 annual insurance premium cost, and that Gulf & Western deliberately did not disclose this document to him before the purchase. Rudolph Hertlein, a vice-president of Gulf & Western, denied that the $11.1 million figure reflected a belief by Gulf & Western that the benefits had vested. Rather, he claimed that the figure represented only a hypothetical calculation for an unlikely scenario in which Mac–Hemp would cease to operate and all the workers would retire simultaneously.

In addition to offering these documents relating to alleged nondisclosures by Gulf & Western, Wittekamp testified on cross-examination that he asked Hertlein and Charles Lewis, a Gulf & Western attorney, just before the completion of the sale, whether retiree group insurance had "vested" and they said no. On appeal, Gulf & Western contends that this testimony did not create an issue of fact for the jury because upon further cross-examination Wittekamp retracted this statement.

Finally, Wittekamp presented his own testimony and that of two of his former attorneys about 1987 discussions between Wittekamp and Gulf & Western's trial attorneys concerning the merits of the retirees' claims in the *Wernert* case. Wittekamp and his former attorneys testified that Gulf & Western's attorneys told them in 1987 that they knew of no documents that specifically provided that retiree benefits were vested. At trial, Wittekamp sought to use this testimony to advance a claim of fraud occurring in 1987; namely, that Gulf & Western sought to prevent him from discovering that it had not told him in 1983 that the benefits had vested.

Gulf & Western moved, both after Wittekamp rested and at the close of all the evidence, for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(a).[6] The district court denied the motion as to Wittekamp's claim concerning the fraudulent inducement by Gulf & Western to hire him at Mac–Hemp. The court, however, did grant the motion with respect to the other claims.

In regard to the fraud claim for the sale of the company in 1983, the district court stated that the crucial issue was not whether the benefits had vested—Gulf & Western conceded at trial that they probably had vested by 1983—but whether there was evidence that Gulf & Western knew that they had vested *and* hid that fact from Wittekamp at the time of the purchase. The district court held that the mere fact that Exhibit 98 was found in Gulf & Western's files did not mean that the Gulf & Western representatives negotiating with Wittekamp knew of its existence and sought to conceal it. The district court noted that Wittekamp presented no evidence showing any such knowledge or intent. The district court also stated that neither Exhibit K nor, in light of Hertlein's uncontradicted testimony, Exhibit 621 showed that Gulf & Western intended to deceive Wittekamp. Thus, in the court's view, he had failed to establish scienter. The district court did not comment on Wittekamp's testimony regarding an oral misrepresentation at the 1983 closing, but given its ruling that there was no evidence that Gulf & Western intentionally or recklessly misrepresented to him that the benefits had not vested, the court apparently did not believe that this testimony created a question for the jury.

The district court also granted judgment for Gulf & Western on any claims based on the 1987 conversations between Wittekamp and Gulf & Western's attorneys because there was insufficient evidence that prior to the settlement of the *Wernert* case any-

one at Gulf & Western knew that the benefits had vested. The court noted further that neither the complaint nor the pretrial documents contained a claim that Gulf & Western was guilty of fraud beyond 1983, and thus the claim was not articulated properly under Fed.R.Civ.P. 9(b). On the remaining fraud claim, the jury found that Gulf & Western had not committed any fraud in connection with Wittekamp's acceptance of employment in 1982.

On appeal, Wittekamp challenges the district court's grant of the motion for judgment as to the 1983 and 1987 fraud claims, the court's instructions to the jury, its dismissal of his punitive damages claim, and its exclusion of extrinsic evidence he offered to aid in the interpretation of the collective bargaining agreements between Mac–Hemp and USW. After reviewing each of these claims, we find them all to be without merit and that the only claim requiring further discussion is Wittekamp's challenge to the district court's grant of judgment as a matter of law to Gulf & Western.

## II. *STANDARD OF REVIEW*

■ We exercise plenary review of the grant of a motion for judgment as a matter of law and apply the same standard as the district court. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3d Cir.1991); *Frank Arnold Contractors, Inc. v. Vilsmeier Auction Co.*, 806 F.2d 462, 463 (3d Cir.1986).[7] Thus, we may sustain the order granting judgment to Gulf & Western only if, viewing the evidence in the light most favorable to Wittekamp and giving him the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability. *Billet v. Cigna Corp.*, 940 F.2d 812, 815 (3d Cir.1991). Under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–54, 106 S.Ct. 2505, 2512–13, 91 L.Ed.2d 202 (1986), we also consider that Wittekamp must satisfy

6. The parties' briefs have referred to the motion as seeking a directed verdict, but the motion more appropriately is termed a motion for judgment as a matter of law because the 1991 revision to Rule 50(a) abandoned the term "directed verdict."

7. Our case law regarding the standard of review on appeals from orders granting directed verdicts is applicable to an order granting a judgment as a matter of law.

a heightened standard of proof-here the clear and convincing standard—in order to support a jury verdict in his favor.

## III. DISCUSSION

■ To establish a claim of fraudulent misrepresentation under Pennsylvania law, which all the parties agree governs, Wittekamp was required to prove by clear and convincing evidence: (1) a false representation of an existing fact or a nonprivileged failure to disclose; (2) materiality, unless the misrepresentation is intentional or involves a nonprivileged failure to disclose; (3) scienter, which may be either actual knowledge or reckless indifference to the truth; (4) justifiable reliance on the misrepresentation, so that the exercise of common prudence or diligence could not have ascertained the truth; and (5) damage to him as a proximate result. *See Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 731 (3d Cir.1991); *Berda v. CBS, Inc.*, 881 F.2d 20, 27 (3d Cir.1989), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23, 26 (3d Cir.1981); *Shane v. Hoffmann*, 227 Pa.Super. 176, 324 A.2d 532, 536 (1974); *Scaife Co. v. Rockwell–Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 454 (1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972). Thus, in considering a defendant's motion for judgment as a matter of law "where fraud is the basis of the [plaintiff's] claim, the initial inquiry for the judge is whether the proof of every element of fraud has met the exacting [clear and convincing] standard, justifying a refusal to grant" the motion and the submission of the case to the jury. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1253 (1983).

### a. Oral Misrepresentations

■ Wittekamp first argues that the jury should have been permitted to consider testimony that, just before the completion of the sale, he specifically asked Hertlein and Lewis whether retiree group health insurance was a vested benefit. However, our review of the trial record leads us to conclude that Wittekamp retracted his testimony on this point and that the jury could thus not have predicated a verdict in his favor on this evidence.

During Wittekamp's direct examination, his attorney asked if prior to the purchase of Mac–Hemp he had thought that the health benefits had vested. Wittekamp replied in the negative, explaining that he had come to this conclusion by reviewing the documents listed in Exhibit K. But notably, during this testimony, Wittekamp did not mention that anybody from Gulf & Western had told him that the health benefits had not vested. However, during his cross-examination, Wittekamp stated that while he never brought up the specific issue of the vested benefits during his negotiations, he had asked Hertlein and Lewis about it at the time of the closing. Although this portion of Wittekamp's testimony is somewhat convoluted, we are satisfied that he claimed to have concluded that the benefits had not vested from his reading of the Exhibit K documents *and* from the representations made by Hertlein and Lewis during the closing.

Yet, Wittekamp's position changed during recross-examination. When Gulf & Western's attorney asked him if he specifically raised with Hertlein and Lewis the question of whether the benefits had vested, Wittekamp replied that he asked whether all the liabilities were reflected in Exhibit K. When the attorney questioned Wittekamp once more "you asked them about retiree medical benefits, yes or no?" Wittekamp answered "I cannot answer that question sir." Wittekamp then went on to explain:

> I asked them specifically [whether] they had listed all the liabilities on Exhibit K. And they said yes. All the contracts, all the agreements, and all the liabilities in excess of $5,000 are specifically listed on Exhibit K.

> • • • • •

> It is a question of playing with words sir. I specifically asked to be [sic] listing all liabilities over $5,000˙ on Exhibit K. And they confirmed that all those liabilities were listed.

Immediately thereafter, the attorney again asked Wittekamp if he specifically raised the issue of the health benefits being vested with representatives of Gulf & Western, to which Wittekamp responded "I think I answered that question, sir." This answer appears to refer to his previous response "I cannot answer that question, sir."

Based on a careful reading of this testimony we find that Wittekamp's retreat from his assertion that he had asked Gulf & Western's representatives whether the health benefits had vested was definite and complete. A close examination of the testimony reveals that Wittekamp fell back to his prior position on direct examination, that his request to Gulf & Western for a written representation (in paragraph 6M of the purchase agreement) as to the completeness of the list of contracts (Ex. K) was, in his judgment, the equivalent of having asked for and received a specific representation that there were no vested benefits. We also find it significant that Harry Messina, the attorney who represented Wittekamp during the negotiations and who was present at the closing, and all the Gulf & Western witnesses involved in the sale, testified that Wittekamp never asked a question about whether retiree group health insurance was vested during the three-day closing. Further, Wittekamp's trial attorney seemed implicitly to have disclaimed Wittekamp's "specific representation" testimony by asserting that it was merely another version of Wittekamp's claim that Exhibit K was misleading. Given these circumstances, and the lack of other evidence showing an affirmative misrepresentation by Gulf & Western, the district court could not have permitted the jury to return a verdict for Wittekamp predicated on his claim of an oral misrepresentation in 1983.[8]

Furthermore, the district court correctly dismissed the 1987 claim of misrepresentation because Wittekamp made no claim of fraud occurring after 1983 in his complaint or his pretrial narrative statements. Therefore, we need not consider its alternative holding that Wittekamp did not adduce sufficient evidence showing that Gulf & Western acted with scienter in regard to the 1987 claim.

### b. *Nondisclosures*

■ Wittekamp also argues that he introduced sufficient evidence to support a jury finding that prior to the 1983 sale Gulf & Western fraudulently concealed that Mac–Hemp's retiree health insurance was vested. More specifically, he points to Exhibit 98—the 1978 health benefits description which suggested the benefits were vested but of which Gulf & Western disclaimed knowledge—and Exhibit 621—the accounting statement which included an assumption that the retiree health benefits would cost $11.1 million, meaning they could not be canceled. Wittekamp contends that inasmuch as Gulf & Western arguably knew of these documents and did not tell him about them, a genuine issue of material fact exists as to scienter.

However, we need not consider this contention. Even if we held that the district court erred in finding that Wittekamp had not introduced sufficient evidence of scienter to allow the deliberate nondisclosure claim to go to the jury, we would not change our result as we are convinced that Wittekamp has failed to adduce clear and convincing evidence of his reasonable reliance on the alleged nondisclosure to preclude granting the motion for judgment. "We can affirm a correct decision on a ground different than that relied on by the district court." *University of Maryland v. Peat Marwick Main & Co.*, 923 F.2d 265, 275 (3d Cir.1991). Therefore, although it was not a basis for the district court's decision, we will affirm the district court's order granting judgment to Gulf & Western on the nondisclosure claim on the basis of Wittekamp's failure to demonstrate justifiable reliance.

We reach this conclusion for several reasons. In the first place, contrary to Wit-

---

8. In this regard, we also note that Wittekamp's trial attorney did not ask the district court to submit to the jury the specific question of whether any oral representation had been made at the 1983 closing.

tekamp's claim that Exhibit K to the purchase agreement did not list the insurance obligation to the retirees among Mac–Hemp's long-term contractual obligations, Exhibit K listed Mac–Hemp's retiree group health insurance program under Items 4(a) and 4(b). This disclosure should have raised a question in his mind as to whether he could cancel this obligation. Furthermore, a reading of the language of the group health plan should have alerted Wittekamp to the fact that he required more information on the vesting issue. For example, paragraph 9.24 of the group insurance program for hourly paid employees provides:

> A person who becomes eligible to receive a surviving spouse's benefit under the company's pension plan applicable to you is also eligible for the hospital and medical coverage described in paragraphs 9.22 and 9.23

Although certainly not the only reasonable reading of this passage, one interpretation of it that should have occurred to Wittekamp was that promising retired people that they will have continuing insurance after their spouses' death means that the insurance will last for the lifetime of the spouses, a possible indication that the insurance could not be canceled.

Even more importantly, Wittekamp admitted that during the presale "due diligence" period in 1983, Gulf & Western had made available to him documents, other than Exhibit 98, which traced the collective bargaining history of the retiree group health insurance; that he elected not to read many of them; and that he did not even ask an attorney to review any of them. Yet, these documents included the group insurance programs for 1981 and 1979, and the USW collective bargaining settlement agreements that initiated the retiree group health insurance program in 1974, and modified it in 1978, and again in 1981. An examination of these documents should have caused Wittekamp concern on the vesting issue. The 1974 Mac–Hemp/USW settlement agreement provided that only retirees not eligible for medicare would be eligible for group insurance and that coverage would "terminate when such

person first becomes eligible for medicare." On the other hand, the 1978 Mac–Hemp/USW settlement agreement, resolving a 1977–78 strike, removed the previous Medicare-age duration limitation, a deletion reflected in subsequent agreements as well. The fact that the initial collective bargaining agreement dealing with group health insurance established a single duration limitation—Medicare age—and subsequent agreements removed that duration limitation and added no other, should have suggested to Wittekamp the possibility that by 1983 there was no duration limitation and the benefits were not cancellable. Thus, while arguably a review of these documents would not necessarily have confirmed that the benefits had vested, it at least should have raised sufficient questions in Wittekamp's mind as to warrant his further inquiry of Gulf & Western. Certainly an experienced labor lawyer would have recognized these questions. Yet, despite the extensive labor relations aspects of the transaction, Wittekamp elected to proceed without advice from any labor attorney in his multi-million dollar purchase.

We note further that as the President of Mac–Hemp and the former CEO of another company, and as a person having long business experience, Wittekamp was clearly a sophisticated party. *Emery v. Third Nat'l Bank of Pittsburgh*, 314 Pa. 544, 171 A. 881, 882 (1934) (declaring that whether reliance on a misrepresentation is justified is dependent in part upon such factors as the respective intelligence and experience of the parties); *B.O. v. C.O.*, 404 Pa.Super. 127, 590 A.2d 313, 316 (1991) (considering subjective characteristics in fraud action to determine whether reliance on misrepresentations was reasonable). As such, he should have recognized that an employer's obligation to provide health benefits may be costly and difficult to terminate. In light of his sophistication, as well as the absence of any special fiduciary or long-standing business relationship with Gulf & Western, giving him a basis for relying on representations made by Gulf & Western, *Scaife*, 285 A.2d at 455; the questions that

reading the past collective bargaining agreements and group health insurance documents should have raised in his mind; and the considerable amount of money involved, Wittekamp was wholly unjustified in assuming that the benefits had not vested simply because Gulf & Western did not indicate that they had vested. This is particularly so because a determination that a benefit is or is not vested necessarily implicates an abstract legal concept on which reasonable people can disagree. *See Bower v. Bunker Hill Co.*, 725 F.2d 1221 (9th Cir.1984). Thus, a claim derived from a determination that benefits are vested, differs in character from more tangible representations, *i.e.*, the amount of accounts receivable or payable or whether a seller owns certain property.

Wittekamp seeks to avoid our conclusion, that he could not rely on Gulf & Western's alleged failure to disclose that the benefits were vested, by arguing that Pennsylvania law places no obligation on a purchaser to conduct an extensive investigation to ascertain the truth of the seller's representations. Although, in certain circumstances, the Pennsylvania courts have limited the extent to which a purchaser must go beyond the purchase documents in investigating the truth of a representation, *see, e.g., Silverman v. Bell Sav. and Loan Ass'n*, 367 Pa.Super. 464, 533 A.2d 110, 115 (1987) (holding that in action for rescission of real estate sale purchaser has no obligation to examine public zoning records prior to a purchase), *allocatur denied*, 518 Pa. 642, 542 A.2d 1371 (1988), the law is clear that a purchaser cannot rely on a misrepresentation that should have been readily apparent from the information provided to him by the seller. Thus, a purchaser is " 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if

he had utilized his opportunity to make a cursory examination or investigation.' " *Bowman v. Meadow Ridge, Inc.*, 419 Pa.Super. 511, 615 A.2d 755, 759 n. 3 (1992) (quoting Restatement (Second) of Torts § 541, comment a (1977)); *see also Scaife Co. v. Rockwell–Standard Corp.*, 285 A.2d at 455 (" 'A misrepresentation as to the subject of a proposed sale will not support an action for deceit if the subject be open to the buyer's observation' " (quoting *Emery v. Third Nat'l Bank*, 308 Pa. 504, 162 A. 281, 283 (1932))).

In this case, it is clear that Wittekamp should have recognized the need to inquire further as to whether the group health insurance had vested from reading the documents that were given to him.[9] Accordingly, although we express no view as to what the result might be under a lesser standard, we are persuaded that Wittekamp failed to adduce sufficient evidence that would allow a jury to find under the clear and convincing standard that he justifiably relied on the nondisclosure.

## IV. CONCLUSION

In view of the aforesaid, the judgment of July 24, 1992, of the district court will be affirmed.

---

**9.** Wittekamp repeatedly has contended that the sheer size of the obligation for health insurance, as compared to the price he paid for Mac-Hemp, demonstrates that he would not have purchased the company subject to vested medical benefits. Thus, for example, he explains in his reply brief, "It requires no leap of logic to conclude that a person does not spend ten million dollars for a company with a 11.1 million dollar obligation." But it is Wittekamp's contention that lacks logic. After all, a prudent purchaser might be delighted to pay $10,000,000 and assume an obligation of equivalent amount to acquire a company of a value in excess of the purchase price and the obligation assumed.