**In re Joel M. ZISHOLTZ and Lois Zisholtz, Debtors.**

**Joel M. ZISHOLTZ, Lois Zisholtz, Plaintiffs,**

**v.**

**ANTHONY CHARLES HOMES, INC., Charles E. Dessert, Defendants.**

**Bankruptcy No. 98–10488DAS. Adversary No. 98–0367DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 13, 1998.

See also 225 B.R. 868.

**826**

David B. Smith, Philadelphia, PA, for Debtors.

Harry J. Giacometti, Philadelphia, PA, Trial Counsel for Debtors.

Stewart B. Liebman, Mittman & Liebman Associates, Montgomeryville, PA, Former State Court Counsel for Debtors.

Michael G. Bowen, Doylestown, PA, for Defendants.

Stephen E. Skovron, Philadelphia, PA, for Robert and Rhona Goldstein.

Melody C. Watts, Deputy Attorney General, Office of Attorney General, Philadelphia, PA, for PA. Dept. of Revenue.

Arthur P. Liebersohn, Philadelphia, PA, Trustee in Martin's Aquarium, Inc., related case.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

 The instant adversary proceeding ("the Proceeding") was initiated by JOEL M. ZISHOLTZ ("Joel") and LOIS ZISHOLTZ ("Lois"; with Joel, "the Debtors") against ANTHONY CHARLES HOMES, INC. and its principal, CHARLES E. DESSERT ("the Defendants"), in the Court of Common Pleas of Bucks County, PA., and removed by the Debtors to this court.[1] Their First Amended Complaint ("the Complaint") seeks judgment against the Defendants in the amount of fifty thousand dollars ($50,000.00) dollars, plus interest and costs, in Counts for breach of contract, trespass, breach of warranty, fraud and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* (referenced by its generic description as a law regulation *unfair* and *deceptive acts* and *practices, i.e.,* "UDAP"), in connection with the Defendants' sale to them of a newly-built "spec" home located at 3375 Lace Leaf Drive, Buckingham, PA. ("the Home"), in December 1992. The Debtors' basic claims are that the price of the Home was wrongly increased due to the Defendants' fraudulent representation that their broker had to be paid a commission of $15,000 and that certain construction work on the Home was defective and unworkmanlike.

---

1. The Debtors filed the Notice of Remand ("the Notice") on July 1, 1998, believing that, since their case was converted to Chapter 11 on April 2, 1998, after it had been filed on January 13, 1998, under Chapter 13, the Notice was timely pursuant to Federal Rules of Bankruptcy Procedure ("F.R.B.P.") 9027(a)(2)(A), requiring the Notice to be filed 90 days after the entry of the order for relief in the case. However, the date of the initial order for relief of January 13, 1998, was unchanged by a conversion. 11 U.S.C. § 348(a). Nevertheless, when there was no opposition by the Defendants to removal, finding that the F.R.B.P. 9027(a)(2)(A) deadline was not jurisdictional, but was subject to extension, *see* 10 COLLIER ON BANKRUPTCY, ¶ 9027.05, at 9027–10 (15th ed. rev.1998), we allowed the Proceeding to remain in this court.

We conclude that the Debtors did not meet the high standard for proof of a fraud in the increase of purchase price, or a violation of UDAP. However, there is evidence that certain wood-staining and plumbing work contracted by the Defendants was defective and/or performed in an unworkmanlike manner. We therefore grant relief in the amount of $3697.69 which the Debtors spent for such repairs and deny the Defendants' counterclaim for $848.00.

## B. PROCEDURAL AND FACTUAL HISTORY

The instant case, presently in Chapter 11, see page 2 n. 1 *supra,* is intertwined with an involuntary chapter 7 case of the Defendants' former aquarium store and service business, Martin's Aquarium, Inc. ("MAI"). On October 16, 1998, we filed an Opinion in MAI's case, presently reported only as *In re Martin's Aquarium,* 225 B.R. 868 (Bankr.E.D.Pa. 1998) ("*Martin*"), in which we set aside the Debtors' transfer of MAI's service business to a corporation owned by them as a fraud upon their principal creditor, Rhona Goldstein.

As we noted in *Martin I, id.* at 871, in a detailed recitation of the procedural history of this and MAI'S case, the Debtors filed their initial Chapter 11 plan and disclosure statement in this case on July 1, 1998. Although they promised to formulate a potentially-confirmable plan by October 23, 1998, they did not do so and, on November 4, 1998, requested a 45–day extension to file an entirely new plan. Since we have become skeptical of their reorganizational prospects, we allowed them only until November 27, 1998, to file the new plan and accompanying disclosure statement.

The facts relevant to the Proceeding began in November 1992, when Lois, after an extended unsuccessful search for a home acceptable to both her and Joel, was attracted to the Home, erection of which was nearly completed. She immediately called Joel, who agreed that the Home was suitable, and negotiations proceeded rapidly with the builder-sellers, the Defendants. Lois testified that, prior to signing the Agreement of Sale ("the A/S") on December 9, 1992, the parties

had originally agreed upon a base purchase price of $460,000. This price reflected a reduction of the $490,000 asking price because the Debtors had dealt directly with the Defendants, thus saving them the expense of a $30,000 commission to realtor James Briggs and his firm ("the Realtor").

Lois testified that, within days after they reached that agreement, Dessert telephoned her and told her that the Realtor had obtained a prospective purchaser for the Home at its asking price and that it would be necessary for the Debtors to compensate the Realtor for half of the commission lost by him ($15,000) or to permit him to sell the Home to the new prospective buyer. The Debtors presented testimony of the Realtor that he had no such new prospective buyer and received no commission or other consideration in the sale. They therefore claimed that this representation made to them by Dessert was false. The Debtors argued that not only did Dessert obtain a release from the Realtor for any commission on the Home, but Dessert hid this fact from the Debtors, thereby allegedly committing fraud, deceit, and misrepresentation as to them.

The Defendants counter-argued that the A/S and the Addendum thereto signed by the parties on December 9, 1992, recited that $490,000 was the purchase price and that this consisted of a base purchase price for the Home of $475,000, plus an additional $15,000 for "extras and/or change orders." Further, with regard to the Realtor's commission, Dessert denied any agreement with him regarding the Home other than the Realtor's agreement to release his commission in exchange for his extending the period of his exclusive listing for a next-door property. Although the Realtor initially denied any consideration for releasing the commission on the Home, he ultimately admitted that he was not "really sure" that no agreement had been made on the other listing.

The parties dispute the significance of an undated document which purports to list the items contained in the $475,000 base purchase price. Dessert claims that a handwritten change of the typed price of $460,000 and the addition three items, back "stairs," "landscaping $2500," and "full bath in base-

ment," indicates that the base price was increased from $460,000 to $475,000 to add these three items, and not to account for the Realtor's commission. The Debtors argue that the value of these three items was much less than $15,000, and that the $15,000 increase is therefore only understandable as accountable for payments of the Realtor's commission. No document was produced, however, which indicates any adjustment on account of the Realtor's prospective commissions.

The parties do not dispute that the Debtors made numerous upgrades and changes to the Home, the total cost of which far exceeded the $15,000 credit allowed for this purpose. However, the Debtors claim that they paid for all these changes, and Dessert, for the most part, agreed. The Debtors do claim that they are entitled to $2925.00 as compensation for their payments to contractor Timothy Devery to correct unworkmanlike woodstaining throughout the Home, $3383.95 for additional staining improvements estimated by Devery but not corrected nor paid for, and $772.69 as compensation for their payments to plumber Ronald Tillett.

Dessert agreed that some compensation for redoing the staining and for plumbing repairs was appropriate, although he claimed that he could have corrected the staining for about $1100. While he agreed that the Debtors compensated him for most of the extras supplied by him, Dessert produced an undated internal document which calculated an $848 ending balance due to him. Dessert's principal grievance with the Debtors was that their numerous excessive change orders unreasonably delayed settlement until June 1993. Dessert conceded, however, that the Debtors had increased their pre-settlement deposit by $100,000 and paid certain penalties for the delay, and produced no agreement entitling him to additional compensation for delay.

## C. DISCUSSION

1. *The Debtors Failed to Prove, by the Requisite High Standard, Fraud in the Increase of the Home's Purchase Price.*

■ The Debtors allege that the Defendants fraudulently misrepresented that the Realtor was to receive $15,000 from them toward his commission as a basis for the increase of the allegedly-agreed purchase price of $475,000. As we recently stated in *In re Wright,* 223 B.R. 886, 896 (Bankr. E.D.Pa.1998),

[i]t is well established that an action for fraudulent misrepresentation requires proof of the following elements: (1) a representation, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, (4) with the intent of misleading another into relying on it; (5) justifiable reliance of the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *See Michael v. Shiley, Inc.,* 46 F.3d 1316, 1333 (3d Cir.1995); *Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1142 (3d Cir.1993); *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 731 (3d Cir.1991), citing *Scaife Co. v. Rockwell–Standard Corp.,* 446 Pa. 280, 285 A.2d 451, 454 (1971); *Step–Saver Data Systems, Inc. v. Wyse Technology,* 939 F.2d 91, 106 (3d Cir.1991); *Weisblatt v. Minnesota Mutual Life Ins. Co.,* 4 F.Supp.2d 371, 377 (E.D.Pa.1998); and *Heffler v. Joe Bells Auto Service,* 946 F.Supp. 348, 353 (E.D.Pa.1996) . . . . Thus, the initial inquiry for the judge is whether the proof of every element of fraud has met the exacting standard. . . . *Delahanty v. First Pa. Bank, N.A.,* 318 Pa.Super. 90, 110, 464 A.2d 1243, 1253 (1983). *Accord, Wittekamp, supra,* 991 F.2d at 1142. Moreover, the plaintiff in a fraudulent misrepresentation case bears a heavy burden in establishing each element of fraud by clear and convincing evidence. *See e.g., Weisblatt, supra,* 4 F.Supp.2d at 377. . . .

■ We applied these same principles to a home purchase contract in *In re Campuzano,* 1992 WL 308518, at *3–*4 (Bankr. E.D.Pa. Oct.20, 1992), where we stated that,

[i]n order to prevail on her common-law fraud claim, the Debtor was obliged to prove fraud by evidence that is "clear, precise and indubitable." *Gerfin v. Colonial Smelting & Refining Co.,* 374 Pa. 66,

97 A.2d 71, 72 (1953); *Highmont Music Corp. v. J.M. Hoffmann Co.,* 397 Pa. 345, 155 A.2d 363, 366 (1959). The evidence must be so cogent "as to enable the [fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts" alleged. *Gerfin v. Colonial Smelting & Refining Co., supra,* [97 A.2d at] 74. [*See also* ] *Ratay v. Lincoln Nat'l Life Ins. Co.,* 378 F.2d 209, 212 (3rd Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Thus, "[f]raud must be established by clear and convincing proof." *Morrison v. Heller,* 183 F.2d 38, 43 (3rd Cir.1950). *Accord, e.g., Loranger Plastics Corp. v. Incoe Corp.,* 670 F.Supp. 145, 147 (W.D.Pa.1987); and *In re Woerner,* 66 B.R. 964, 972 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 86–7324 (E.D. Pa. April 28, 1987) . . . .

We cannot and therefore do not determine that Lois' testimony is more credible than that of Dessert on this point. It is apparent that the Realtor did not in fact receive any commission for the Home, but it appears that he did receive an extension of another listing, and this may very well have been adequate consideration in the real estate industry for the Realtor to have waived his commission. Given the six-year lapse since this transaction occurred, it is not surprising that the Realtor testified, at the conclusion of his testimony, that he was not "really sure" whether the extension was given to him as a condition to release his commission on the Home or not.

There seems to be little doubt that Dessert was motivated to attempt to get as high a price for the Home as possible by presenting the Debtors with the prospect of other buyers. However, there is also little doubt that the Debtors were willing to pay a $475,000 base price for the Home. We are inclined to view the circumstances as involving negotiation tactics which both sides, with the benefit of hindsight, now perceive differently. We believe that Dessert did attempt to scare the Debtors into paying a higher price with the prospect of other buyers. What we are reluctant to conclude is that he made the specific misrepresentation that Lois now recites. Some of her memory appears to be colored, over the six-year period, by her own anxiety in finally discovering a suitable home for the Debtors after a long search and a measure of "buyer's regret" that the Debtors overpaid as a result of Dessert's taking advantage of this anxiety. However, Dessert is a small builder whose demeanor did not reflect overwhelming business sophistication, and the Debtors are experienced business persons. The prospect of overreaching by the Defendants as to the Debtors was therefore minimal.

■ In any event, we find lacking the requisite "clear and convincing" evidence of a definite misstatement, made falsely, with a specific intent of misleading the Debtors, on the part of Dessert. We also feel that the elements of reliance and proximate cause are weakened by the Debtors' obvious willingness to pay the $475,000 price, for whatever reason. The documents which memorialize the transaction nowhere reference the $15,000 commission allowance to the Realtor.

■ As in *Campuzano, supra,* at *4, we are obliged to observe that "[u]nless . . . fraud is proven, the parol evidence rule would bar any claim" contrary to the written documents. *See In re Johns,* 1990 WL 61765, at *2–*3 (Bankr.E.D.Pa. May 8, 1990); *In re Frymire,* 96 B.R. 525, 535 (Bankr. E.D.Pa.), *vacated in part on other grounds & aff'd. in part sub nom. Frymire v. Paine-Webber, Inc.,* 107 B.R. 506 (E.D.Pa.1989); and *Scott v. Bryn Mawr Arms, Inc.,* 454 Pa. 304, 307–08, 312 A.2d 592, 594 (1973).

We therefore reject the Debtors' request for a $15,000 rebate in the price of the Home due to the alleged fraud of the Defendants.

2. *The Debtors Proved Breaches as of the Purchase Contract Valued at $3697.69, and the Defendants Failed to Sufficiently Substantiate Their Counterclaim.*

The Debtors also allege that the Defendants constructed the Home in a defective and unworkmanlike manner in two respects: (1) the wood staining of the floors, window trim, mantel, oak staircases, and crown molding; (2) in installation of plumbing fixtures upside down. Neither party referenced the paragraphs of the A/S relevant to such claims, which read as follows:

7. WARRANTIES:

(a) Seller agrees to perform all work under this Agreement in a good and workmanlike manner and expressly warrants (such warranty to survive Settlement) in lieu of any other warranties or representations expressed or implied for a period of one (1) year after the date of settlement, that it will correct any material defects in the heating, plumbing, air conditioning, electrical, roofing or major structural systems of the premises and water in the basement ... This warranty shall apply to all material defects in these systems arising during the first year after settlement.

(b) The maximum liability to Seller under this warranty shall be the replacement of the defective portion of the Premises. In no event shall Seller be liable for special or consequential damages or personal injuries arising from any breach of this warranty or of the Premises has been subject to misuse or damages by accident not caused by Seller, unless it is determined that Seller committed gross negligence in its workmanship involving said premises ....

■ In Pennsylvania, the common law doctrine of *caveat emptor* historically applied to sales of real property. *Elderkin v. Gaster*, 447 Pa. 118, 123, 288 A.2d 771, 774–75 (1972). Thus, traditionally in the absence of fraud or misrepresentation, a vendor was responsible for the quality of the property being sold by him only to the extent for which the vendor expressly agrees to be responsible. *Id.,* 447 Pa. at 124, 288 A.2d at 774–75. The *Elderkin* court concluded, however, that an implied warranty of workmanlike construction and habitability does arise in the purchase of a new home. 447 Pa. at 128, 288 A.2d at 777. Furthermore, the foregoing paragraphs of the A/S create an express warranty that the Defendants will correct any internal defects in, *inter alia,* plumbing and major structural systems, at least to the extent of the reasonable cost to replace the defects. We believe that, if the staining is not included within the express warranty, and it is also within the scope of the implied warranty.

We find the testimony from Devery and Tillett about the necessary repairs needed for re-staining wood and repairing plumbing fixtures, respectively, to be credible. Dessert did not contest same, except that he believed that Devery's changes and estimates were excessive. There is no dispute that the Debtors actually paid $2925.00 to Devery for restaining wooded floors and $772.69 for plumbing repairs to Tillett. However, the additional $3383.95 which Devery estimated would be necessary to completely finish the re-staining was not done by him and was not of course paid.

We are unwilling to include this sum of $3383.95 as an element of the Debtors' damages. Although the Debtors spent thousands of dollars for changes and upgrades in the Home, they did not see fit to contract for the relatively modest additional repair work to Devery. This fact causes us to conclude that this work is likely ornamental frill. The failure to do such work therefore does not constitute unworkmanlike construction or constitute a material defect within the scope of the express warranty in the A/S. However, we do find the other charges, totaling $3697.69, for which the Debtors contracted and paid, to be within the scope of both their express and implied warranties and therefore to be compensable from the Defendants.

■ Finally, with respect to Dessert's $848 counterclaim, we find it unsupported by the preponderance of the evidence. The only evidence supporting this claim are crude handwritings on an internal document of the Defendants. There is no evidence that, in the five and a half years since the settlement, Dessert ever made a demand upon the Debtors for this precise sum. His principal complaint against the Debtors in the transaction was the delay which their many change orders caused to his receiving prompt payment. However, he presented no evidence of any right to further damages for this delay. The Counterclaim will therefore be denied.

3. *The Debtors Failed to Establish a Viable UDAP Claim.*

■ Pennsylvania's UDAP protects consumers of goods and services by "plac[ing] on more equal terms seller and consumer." *In*

*re Smith,* 866 F.2d 576, 581 (3d Cir.1989). As stated, at *id.,* "Section 3 of the UDAP provides that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by ... section 2 of the act and regulations promulgated under section 3.1 of this act are hereby declared unlawful" and that "[s]ection 2 of the UDAP enumerates seventeen specific acts which constitute unfair or deceptive acts or practices."

■ The *Smith* court further stated that, in order to prevail under UDAP, plaintiffs must overcome three hurdles. *Id.* First, they must establish that the transactions at issue are a trade or commerce within the meaning of section 3 of UDAP. *Id.* Second, they must demonstrate that UDAP grants a private cause of action for injuries sustained appurtenant thereto. *Id.* Third, they must establish that the act complained is either unfair or deceptive because it is fraudulent conduct creating a likelihood of confusion or misunderstanding within the meaning of section 2 and 3 of UDAP. *Id.*

Here, the Debtors contend that Defendants' conduct falls within several provisions of UDAP; *i.e:* (1) "making false or misleading statements concerning the reasons for, existence of, or amounts of price reductions," 73 P.S. § 201–2(4)(xi); (2) "failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or service is made," 73 P.S. § 201–2(4)(xiv); (3) "making repairs, improvements or replacements on tangible, real or personal property, of a nature or qualify inferior to or below the standard of that agreed to in writing," 73 P.S. § 201–2(4)(xvi); and (4) "engaging in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding," 73 Pa. P.S. § 201–2(4)(xvii).

■ In applying the three-prong test of *Smith,* we conclude that the first two prongs are satisfied in this case. First, the sale of residential real estate is within purview of UDAP. *See, e.g., Metz v. Quaker Highlands, Inc.,* 714 A.2d 447 (1998); and *Gabriel v. O'Hara,* 368 Pa.Super. 383, 389–92, 534 A.2d 488, 491–93 (1987). *Accord, Campuzano, supra,* at *4. Second, 73 P.S. § 201–9.2 provides

that "any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of the UDAP may bring a private action to recover damages." Under this broad language of the statute, we conclude debtors may properly allege a private action under § 9.2. *See Smith, supra,* 866 F.2d at 582.

The third prong, however, requires the Debtors to establish that the Defendants' conduct was either unfair or deceptive because it is fraudulent conduct creating a likelihood of confusion or misunderstanding within the meaning of sections 2 and 3 of UDAP. *Smith, supra,* 866 F.2d at 581. At the very least, the Debtors must establish that the Defendants engaged in "pervasive illegal conduct" to state a cause of action under UDAP. *See In re Milbourne,* 108 B.R. 522, 534 (Bankr.E.D.Pa.1989).

■ We failed to find any fraud of the Defendants in the negotiations concerning the price of the Home. *See* pages 828–29 *supra.* Therefore, no UDAP claim is stated as to this claim. *See also In re Gardner,* 218 B.R. 338, 349 (Bankr.E.D.Pa.1998); and *Campuzano, supra,* at *4.

We further fail to find any element of fraud or "pervasive illegal conduct" in reference to the Debtors' warranty claims. We note that the parties dealt on equal terms, with the Debtors appearing, if anything, the more sophisticated parties. While we find that the Defendants are in fact liable to the Debtors for damages of $3697.69, this claim is awarded in the context of a suit demanding total damages of $50,000. We have awarded the Debtors only about half of what they sought for warranty claims alone. The only UDAP claims which we find are possible relevant are the Debtors' claims under 73 P.S. §§ 201–4(xiv) or (xvi), relating to a failure to comply with warranties and making poor quality repairs or improvements. We do not find the relatively modest valid warranty claims to be indicative of actions

by the Defendants so tainted with fraud or pervasive illegal conduct as to warrant any enhancement of the damages under the foregoing UDAP provisions. Accordingly, we reject the Debtors' UDAP claims.

*D. CONCLUSION.*

An order awarding the Debtors $3697.69 for breaches of warranties, but denying all other claims of the Debtors, and the Defendants' counterclaims, will be entered.