**In re James Robert WRIGHT a/k/a Wright Enterprises a/k/a Nino's Pasteleria Gloria Jean Wright, Debtors.**

**Bankruptcy No. 98–16580DAS, (formerly Bankruptcy No. 96–22094TMT).**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 27, 1998.

888

James Robert Wright, Eston, PA, pro se.
Gloria Jean Wright, Easton, PA, pro se.

Frederick L. Reigle, Reading, PA, for Standing Chapter 13 trustee.

Kathleen Kernaghan, District Counsel, IRS, Philadelphia, PA, for Internal Revenue Service.

Michael A Henry, Allentown, PA, for Eugene Fritzinger.

Anne P. Felker, Bethlehem, PA, Judith L. Jones, Easton, PA, for Nazareth National Bank.

Frederic Baker, Philadelphia, PA, Asst U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

At issue in the now-*pro se* joint Chapter 13 bankruptcy case of JAMES ROBERT WRIGHT and GLORIA JEAN WRIGHT ("the Debtors") are the Debtors' objections ("the Objections") to proofs of claim (collectively, "the Claim") filed in their case by Eugene Fritzinger ("the Claimant"), and entities apparently controlled by him, arising out of the Debtors' failure to pay to the Claimant the balance of the agreed purchase price for a bakery located in the Allentown Fairgrounds ("the Bakery").

Although resolution of the Objections, like the case itself, has been delayed by the intensity of the Debtors' *pro se* advocacy, resulting in recusal of the judge originally assigned to the case, the issues instantly before us are rather simple. The Debtors have proven none of the elements of the torts in which the Objections sound, *i.e.,* fraud or negligent misrepresentation on the part of the Claimant in the sale process. We particularly find a lack of proof of the Debtors' justifiable reliance upon the Claimant's alleged misrepresentations regarding the financial status of the Bakery or of their injuries resulting therefrom. Therefore, the Debtors' demand for rescission of the contract, particularly at this late juncture, must be rejected, and the Objections must be overruled. We will however, further direct that the Claimant be confined to one unsecured claim, in the slightly reduced amount now asserted by the Claimant, during the confirmation process.

Due to the age of this case, we are obliged to bring the confirmation process promptly to a close by requiring the Debtors to file any further Amended Chapter 13 Plan or necessary Amended Schedules in light of this Opinion and the Objections to confirmation of the proposed plan of record by September 14, 1998, and achieve confirmation of a plan by October 13, 1998, or this case will be dismissed.

### B. FACTUAL AND PROCEDURAL HISTORY

To characterize the procedural history of this case as tortuous is an understatement. We begin by noting that, on May 21, 1998, our colleague, the Honorable Thomas M. Twardowski recused himself subsequent to, but apparently not on the basis of, a recusal motion of the Debtors. Although upon reassignment to this court, we have studied the docket (now containing 253 entries) and the file, and received requested status reports from several interested parties, we cannot and therefore do not profess total understanding concerning each of the 200 docket entries that preceded Judge Twardowski's recusal.

It is clear that the case was filed on July 10, 1996, by an experienced bankruptcy practitioner, Eric L. Leinbach. A rather ordinary Chapter 13 plan, calling for payments of $240.24 for 60 months, the aim of which was apparently to prevent foreclosure of the Debtors' residence at 205 Tumble Creek Road, Easton, Pennsylvania ("the Home"), by the mortgagee, Nazareth National Bank ("NNB"), as well as stay any action by the Claimant, was filed on July 24, 1996.

The case apparently proceeded normally until, prior to a second continued confirmation hearing of March 27, 1997, the Claimant, as well as the Internal Revenue Service ("the IRS"), filed objections to confirmation of the proposed plan; NNB filed a motion for relief from the automatic stay; and the Standing Chapter 13 Trustee, Frederick L. Reigle, Esquire ("the Trustee"), filed a motion to dismiss this case for lack of plan payments. On March 27, 1997, Leinbach was permitted to withdraw as counsel and the Debtors were

ordered to file an amended plan by May 8, 1997, or the case would be dismissed.

On June 5, 1997, Judge Twardowski dismissed the case because he found that the amended plan was not filed as directed. Apparently due to the discovery that the Debtors had, on May 5, 1997, in fact filed, *pro se,* a document which was colorably an amended plan, Judge Twardowski, after denying a motion of the Debtors to reconsider the dismissal order on September 18, 1997, granted a successive motion to reconsider that order on October 30, 1997, thus revitalizing this case.

The Claimant initially filed a claim in the amount of $63,157.74 on October 3, 1996, alleging secured status on the basis of a prepetition confessed judgment entered against the Debtors in the Northampton County Court of Common Pleas ("the CCP"). However, on February 7, 1997, the CCP, upon motion of the Debtors, struck the confessed judgment. On February 14, 1997, the Claimant amended the claim to assert a $63,157.74 *unsecured* claim.

On May 5, 1997, the Husband Debtor filed what appears to be the Objections which triggered the instant contested matter. That document, which also objects to a claim of the IRS and answers NNB's stay relief motion, states as follows:

1. I hereby object to the claim of creditor Eugene Fritzinger on basis that monies received by Eugene Fritzinger from July 1995 thru December 1995 were not credited to James Wright and Gloria Wright.

2. Eugene Fritzinger withheld payments from November 8, 1995, to December 21, 1995 for purpose of maintaining a foreclosure action.

3. In purchase agreement $130,000.00 in expenditures were withhold from financial ledgers supplied to James Wright and Gloria Wright.

4. In Proof of Claim dated 10/1/96 equipment was to be sold and credited as directed by trustee in September 1996 and re-affirmed by James Watts in his Proof of claim, but 9 months later equipment has not been sold nor has monies been credited to James Wright and Gloria Wright.

5. Said actions of creditor Eugene Fritzinger were perpetrated by fraud rendering any monies allegedly owed Null & Void.

The matter was apparently rendered moot until the October 30, 1997, reinstatement order was entered. That order listed several matters pending in the case prior to its dismissal, including the Objections, for hearings on December 4, 1997.

A hearing on the Objections, which Judge Twardowski apparently determined was the first order of business upon reinstatement, in fact commenced on December 4, 1997. The Debtors called Robert Panek, a part-time baker whom the Claimant paid "under the table," and Charles Strezlecki, the claimant's bookkeeper. When the hearing resumed on January 28, 1998, the Debtors called their daughter, Gidget M. Mock; the Claimant; and the Claimant's attorney and accountant, respectively, Robert A. Weinert, Esquire, and John D. Rossi, III.

Oddly, neither of the Debtors testified and all of the witnesses called by the Debtors except Mock were allies of the Claimant, presumably called to elicit admissions helpful to the Debtors. Mock testified that she initiated the Bakery's sale by calling a newspaper ad to her father's attention. After reviewing a "payroll tape" and daily "disbursement journals" during a meeting at the Bakery among the Debtors, Mock, and the Claimant, the Husband Debtor apparently agreed, at that time or shortly thereafter, to purchase the Bakery from the Claimant for $85,000. The terms of this purchase were that $12,500 was paid upon the signing of an Asset Purchase Agreement ("the Agreement") on or about May 22, 1995, and a $12,500 balance was paid at a closing of July 5, 1995, at which time a Bill of Sale ("the Bill") was executed.

A transcript of a CCP deposition given on March 5, 1996, by the Husband Debtor was the only document of record which we could locate which set forth the Debtors' version of the facts relevant to the Objections. Therein, the Husband Debtor asserted that the Claimant indicated that his business made

$166,000 in 1994. He further testified that the Debtors Claimant's tax returns, particularly when the Claimant advised him that the $166,000 figure included about $36,000 from a business run by the Claimant known as the "Nut Hut" and from a second bakery. However, although Mock "consulted" her father's accountant, Marty Rappaport, about this transaction, and the Debtor hired an attorney named Redding to represent him at the closing, the Debtors had already signed the Agreement and paid $12,500 toward the purchase before these consultations occurred.

The terms of the purchase required that the Debtors pay the remaining $60,000 of the price, plus ten (10%) percent interest on the balance. The terms required weekly payments in the amount of $256.61 for six years, or 312 weeks.

The Claimant contended that he accurately reported the financial status of the Bakery, informing the Debtors of all expenses, including rental charges and fees that the Allentown Fairgrounds charged to the Bakery. He claims that the Debtors asked him to provide figures on the gross amount of the Bakery's business and certain of its expenses and income. Further, he testified that there was only one set of books for all of his businesses which contained this information, and he had no way of knowing which expenses were attributable to the Bakery only. The Claimant who, on the basis of his testimony, did not appear to be a sophisticated businessman, testified that he accurately advised the Debtors that only his accountant and bookkeeper knew this information, and that he requested his bookkeeper to provide it to the Debtors. The Claimant specifically testified that he told the Debtors that $30,000 to $32,000 of the income designated on the document that his bookkeeper provided to them did not pertain to the Bakery, but was derived from the Nut Hut. In sum, the Claimant contended that he accurately supplied to the Debtors all of the information which they specifically requested be provided from him to the best of his ability.

Bookkeeper Strezlecki testified that he did not tell the Claimant nor the Debtors that the information he prepared upon the Claimant's request was accurate financial information for the Bakery. Rather, at the Claimant's request he compiled a list of all of the Bakery's major categories of expenses. He further testified that he could not compile a financial statement for the Bakery in any event because all of the businesses owned by the claimant used the same set of books and one checkbook. He stated that, in order to separate the Bakery's expenses, an audit would have to be done. No evidence was presented that the Debtors ever made a request for an audit.

The Debtors, on the other hand, apparently contend that the Claimant defrauded them into believing that the financial information given to them presented a complete financial picture of the Bakery. They contend that the Claimant intentionally gave them misleading income information which commingled data from the two bakeries and the Nut Hut. They also state that the Claimant did not tell them he paid several people who worked for the bakery in cash "under the table" and that this expense was not designated on the books of the business.

The Debtor apparently began making the weekly payments of $256.51 to the Claimant. No evidence regarding the Debtors' finances while they operated the Bakery was offered, although their failure was apparently swift and sudden, because the business had been closed for some time as of the date of the March 5, 1996, deposition.

After the hearing of January 28, 1998, during a period apparently established for post-hearing briefing by Judge Twardowski, the skirmishes between the Debtors and the Claimant escalated. The Claimant filed what it termed a "protective" claim in the amount of $60,319.25 on behalf of "Gene Fritzinger, Inc.," to which the Debtors promptly also objected. The Debtors filed what they termed a motion for relief from the automatic stay to resume parallel litigation in the CCP. On March 17, 1998, the Debtors filed motions for sanctions and contempt against the Claimant's counsel in this case, mainly in reference to certain alleged actions by him in the CCP. Both parties filed briefs relevant to the objections in April 1998, but the issue was unresolved as of the date of Judge Twardowski's recusal.

Our first action after obtaining the case file was to issue an order of May 22, 1998, requesting that all interested parties report in writing on the status of all matters they believed were pending in the case on or before June 11, 1998, and scheduling a status hearing on June 17, 1998. On June 8, 1998, having already received the reports, we entered a further order stating that we would first determine whether the case was viable by ascertaining whether the Debtors were making plan payments. Next, we stated that, unless the case were dismissed on the ground that payments were delinquent, we would hear the stay relief motions of NNB and of the Debtors to proceed in the CCP on June 17. Finally, we stated that, if the case remained viable after the foregoing matters were resolved, we would attempt to develop a process for hearing and deciding the Objections.

After the proceedings of June 17, 1998, our following rulings were reflected in orders of June 18, 1998:

1. Both stay relief motions were granted.

2. The debtors were directed to file and serve an amended Chapter 13 plan by June 30, 1998, and begin payments pursuant thereto by July 15, 1998, or advise us that they did not oppose dismissal of the case.

3. Pursuant to the parties' agreement to the decide the Objections on the record made before Judge Twardowski, as supplemented at a hearing scheduled before us on July 23, 1998, the Claimant was to obtain and submit copies of the Transcripts and the Exhibits from the December 4, 1997, and January 28, 1998, hearings to the Debtors and the court by July 2, 1998, which could be supplemented by the Debtors by July 10, 1998.

4. All of the other various motions of the Debtors were denied except a motion claiming a stay violation by attorney Joseph C. Bernstein, which was also listed for a hearing on July 23, 1998.

The Debtors timely filed an amended plan proposing payments of $93.27 for 36 months. All of the payments were to be distributed in different amounts to alleged unsecured creditors. The Claimant and the IRS were allotted $1.00 and 0, respectively.

The Claimant, apparently due to unforeseen costs, did not submit the copies of the Transcripts and Exhibits until July 22, 1998. This delay prompted more motions of the Debtors for sanctions and contempt against the Claimant, plus related motions for summary judgment and a declaratory judgment, basically requesting that the Claim be summarily stricken because of the Claimant's failure to strictly adhere to terms of the June 18, 1998, order. In orders of July 14, 1998, and July 23, 1998, the Debtors' response dates were set back and the supplemental hearing was continued until July 30, 1998.

Apparently dissatisfied with what they perceived as leniency toward the Claimant in this disposition, the Debtors filed a motion to recuse this court on July 27, 1998, which we denied the next day. After an extended hearing at July 30, 1998, an action pursued by Bernstein was deemed to be in violation of the stay, but no damages were awarded because, *inter alia*, none were found proven. The Debtors' motions for contempt, sanctions, summary judgment, and declaratory relief were all denied. The only supplements to the prior evidence presented on December 4 and January 28 relative to the Objections were the Debtors' calling the Claimant again as a witness. At the Debtors' request we also directed the Claimant to produce his 1993, 1994, and 1995 state and federal tax returns, and we asked the Debtors to forward us a copy of their April 1998 brief (which was not be found in the record) by August 7, 1998. The parties were to submit any supplemental briefs by August 21, 1998.

Although the proceedings of July 30, 1998, were conducted civilly, we do note that the next day, the Debtors forwarded a Notice of Judicial Misconduct to this court, which we advised them must be filed with the Court of Appeals. Also, on August 10, 1995, the Debtors filed a Notice of Appeal from "the Order or Decree ... entered in this adversary proceeding [sic] on July 31, 1998." Finally, the Debtors filed what they termed a motion to declare that documentation need not be attached to proofs of claim in this Circuit, which we denied on August 12, 1998, as incomprehensible, at least in its pertinency to this case.

## C. DISCUSSION

1. *The Debtors' Pro Se Status Does Not Provide Them with Dispensations in Proving Their Claims.*

In light of the broad range of attacks on the Claim set forth in the Objections filed by the Debtors, several of which recite issues do not appear to be pursued by the Debtors, we believe that we are obliged to address and decide the issues as they were laid out in the parties' briefs. *Compare In re Main, Inc.,* 223 B.R. 457, 461 (Bankr.E.D.Pa. August 6, 1998) (where the pleadings did not "mesh very well" with the record, we addressed the issues as they were laid out in post-trial briefs). This task is complicated considerably by our difficulty in comprehending the Debtors' post-trial submissions as well.

The Debtors apparently recognize their deficiencies in presenting their claims, as they generally cite *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), as a basis for dispensations in their behalf at the outset of most of their pleadings, including both of the briefs filed in reference to the Objections at issue. We note, however, that *Haines* addresses pleadings, and counsels only that *pro se* litigants are "entitled to an opportunity to offer proof" to support their claims. *Id.* at 521, 92 S.Ct. 594. However, as a *pro se* litigant passes out of the pleadings stage and into the arena of attempting to prove claims at trial, the dispositions largely end. "Although the pleadings of *pro se* litigants are construed liberally, there is no lower standard when it comes to rules of evidence and procedure." *Powers v. Runyon,* 974 F.Supp. 693, 696 (S.D.Ind.1997). *See also Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 140 (1st Cir.1985) ("the right of self-representation is not 'a license not to comply with relevant rules of procedure and substantive law,'") quoting *Faretta v. California,* 422 U.S. 806, 835 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). As to their claims that they were defrauded or subject to misrepresentations at the hands of the Claimant, which is the thrust of the Objections, they are therefore held to the same burdens of proving the necessary elements of their claims as any litigant, represented by counsel

or not. *See Carmel v. Clapp & Eisenberg, P.C.,* 960 F.2d 698, 703 (7th Cir.1992); and *Smathers v. Smathers,* 448 Pa.Super. 162, 165, 670 A.2d 1159, 1160 (1996).

The argument featured in the Debtors' initial brief filed in April 1998 is that the Claim was based on a confessed judgment which was vacated by the CCP, and that, for that reason, he no longer has a valid claim against them. Thus, in that brief the Debtors do not assert any claims of fraud or misrepresentations against the Claimant, but rather rest their Objections solely on the basis that the confessed judgment was vacated. Thus, they state: "James and Gloria Wright have chosen not to address the fraud issues in this brief because of the clearly fatal, procedural defect in the Judgment by Confession...." *See* Brief in Support of Debtor's [sic] James Robert Wright and Gloria Jean Wright for Dismissal of Eugene Fritzinger Proof of Claim, at 4.

The Claimant, in his initial brief in reply, points out that the confessed judgment was vacated by the CCP for procedural reasons and not on the basis of any deficiencies in his substantive claims. As proof of this contention, he points to the CCP's reliance, in the decision striking the judgment, on Pennsylvania Rule of Civil Procedure ("Pa.R.Civ.P.") 2951, which provides when a prothonotary (clerk of court) can strike a confessed judgment and when a creditor must file a complaint for confession of judgment.

In their post-trial brief, entitled "Mandatory Judicial Notice of Motion to Declare the Cancellation of Bill of Sale and Agreement for Intentional Misrepresentation of Books and Records by Eugene Fritzinger," the Debtors state, on the first page, "WE DECLARE THE CANCELLATION OF BILL OF SALE AND AGREEMENT, FOR INTENTIONAL MISREPRESENTATION OF BOOKS AND RECORDS BY EUGENE FRITZINGER." The three following pages of text recite that the Claimant's tax returns, compared to the information supplied to the Debtors, establish misrepresentation and an "artifice to deceive" on the part of the Claimant. We interpret these submissions as an abandonment of any argument based on the

894

striking of the confessed judgment and a reliance on fraud or misrepresentation as a ground for attack of the Claim.

2. *The State Court's Striking of the Claimant's Confessed Judgment Did Not Extinguish the Debt Owed to Him by the Debtors.*

■ Although the Debtors may be deemed to have abandoned any argument on the instant Objections based on the striking of the confessed judgment previously entered against the Debtors by the CCP because they failed to address that issue in their most recent brief, we will address that issue in an abundance of caution because it was featured in their previous brief. At the outset, we note that we have consistently recognized the constitutional infirmities of the use of confessed judgments as a procedural device in any setting. *See In re Road Patch Services, Inc.,* 154 B.R. 869, 871–73 (Bankr.E.D.Pa. 1993); and *In re Souders,* 75 B.R. 427, 433–38 (Bankr.E.D.Pa.1987). In Pennsylvania, the use of confessed judgment in all "consumer credit transactions" has been abolished. *See* Pa.R.Civ.P. 2951(a)(2)(ii); and Note to Pa.R.Civ.P. 2950. As to business transactions, in which confessed judgments are still permissible, it has been properly stated that a "[c]onfession of judgment is a powerful tool, because it effectively prevents the debtor from having his day in court." *PNC Bank v. Bolus,* 440 Pa.Super. 372, 379, 655 A.2d 997, 1000 (1995). Consequently, a confession of judgment "must be exercised fairly and with exacting precision." *Id.*

In this case, the Debtors successfully petitioned the state court to strike the confessed judgment obtained by the Claimant on the grounds that the prothonotary had no authority to enter the judgment in those circumstances. The CCP nevertheless held that, pursuant to Pa.R.Civ.P. 2951 and 2952, the Claimant could have properly proceeded by filing a complaint in confession of judgment against . the Debtors. *See Stein v. Penncrest Construction Corp.,* 280 Pa.Super. 560, 562–63, 421 A.2d 1074, 1075 (1980).

The Debtors' initial brief, in an effort to make more of this decision than it is worth, argues that the judgment by confession obtained by the Claimant should be stricken with prejudice because the Claimant failed to file a complaint in confession as is the proper procedure under Pennsylvania law and because he failed to aver that the Debtors were in default under the Judgment Note, both requirements of Pa.R.Civ.P. 2951 and 2952.

If the Debtors were utilizing this argument to seek from us an order that the Claimant's confessed judgment should be stricken with prejudice, we do not believe that we have power to so order. Moreover, even if we did have such power, we would refuse to make any such determination. The state court has already stricken the judgment by confession and, in doing so, did not choose to make that determination with any preclusive stipulations upon the Claimant. If the Debtors wanted to forever preclude the Claimant from being able to recover on the judgment note, they could have so argued before the CCP. When the CCP did not strike the judgment with prejudice, the Debtors could have appealed that decision. This court has no power to revise the CCP's unappealed order.

■ However, the CCP decision is of great practical value to the Debtors. Pennsylvania law holds that, when a confessed judgment has been stricken, the lien of the judgment or any execution issued on the judgment is annulled. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1263 (3d Cir.1994); *Antipas v. 2102, Inc.,* 1998 WL 306537, at *2 (E.D.Pa. June 9, 1998); *Nelson Co. v.. Amquip Corp.,* 128 B.R. 930, 934 (E.D.Pa.1991) *aff'd,* 959 F.2d 1260 (3d Cir.1992); *Resolution Trust Corp. v. Copley Qu–Wayne Associates,* 546 Pa. 98, 106, 683 A.2d 269, 273 (1996); and *Hagel v. United Lawn Mower Sales & Service, Inc.,* 439 Pa.Super. 35, 40, 653 A.2d 17, 20 (1995) (all citing Explanatory Notes to Pa.R.Civ.P. 2959(f)). Thus, although execution was issued upon the Claimant's confessed judgment, the striking of the judgment eliminates the lien. As a result, the Claimant was obliged to reclassify his claim as unsecured. This reclassification has a significant effect on the Debtors' future efforts to obtain confirmation of their Chapter 13 plan.

■ On the other hand, Pennsylvania courts have held that, generally, striking a confessed judgment has no prejudicial effect or the merits of the underlying cause of action, and that the creditor can go back to the prothonotary and properly confess judgment for the amount of money stated in the note, *see Bolus, supra,* 440 Pa.Super. at 379, 655 A.2d at 1000, or by filing a suit on the instrument itself. *U.S. Savings & Trust Co. v. Helsel,* 332 Pa. 433, 2 A.2d 823 (1938); *Dunn v. Orloff,* 420 Pa. 492, 503, 218 A.2d 314, 320 (1966) (once a judgment is opened or vacated, proceedings on a judgment note are de novo); *J.M. Korn & Son, Inc. v. Fleet–Air Corp.,* 300 Pa.Super. 458, 462, 446 A.2d 945, 947 (1982) (same); and *Poelcher v. Zink,* 375 Pa. 539, 542, 101 A.2d 628, 629 (1954) (same).

Accordingly, it is clear that the mere fact that the state court struck the confessed judgment obtained by the Claimant against the Debtors does not render the Claimant's underlying claims against the Debtors null and void. Those claims against the Debtors may still be asserted against the Debtors by filing proofs of claims against them in this bankruptcy case, as the Claimant has done.

3. *The Claimant Had No Affirmative Duty to Disclose Financial Information Concerning the Bakery to the Debtors.*

■ In their recent brief, the Debtors now reassert that the substance of their Objections is that the Claimant defrauded them in their purchase of the Bakery by failing to disclose to them the Bakery's full and complete financial information, *i.e.,* all of its income and expenses. For his part, the Claimant basically admits that he did not provide the Debtors with all of the Bakery's available financial records. However, he asserts that he provided the Debtors with all of the information which they specifically requested, and all that was available to him. The Debtors apparently contend, in response, that the documentation provided was misleading in that it only showed a partial picture of all of the expenses of the Bakery. Thus, the matters in dispute are (1) exactly what information the Debtors requested and whether it was provided to them, which is a factual issue; and (2) whether the Claimant had an affirmative duty to provide more complete or accurate financial records regarding the operation of the Bakery to the Debtors for their inspection prior to their purchase of the Bakery, even if they did not specifically request same, which is a legal issue.

■ As to the legal issue, the law is clear that there is no presumption that fraud has occurred in the sale of a business merely because the business fails under new ownership. Fraud must be proven; it is not presumed. *See Paz v. Hbk Enterprises, Inc.,* 36 Lehigh L.J. 431, 434 (Lehigh Co. C.P.1975), citing *Highmont Music Corp. v. J.M. Hoffmann Co.,* 397 345, 350, 397 Pa. 345, 155 A.2d 363, 366 (1959); and *Gerfin v. Colonial Smelting & Refining Co.,* 374 Pa. 66, 67, 97 A.2d 71, 72 (1953). Some of the ways in which fraud can be proven is to show that, in the sale of a business, the seller either made misrepresentations regarding the profitability of the business to the buyer, or made misleading statements or intentionally gave incorrect financial information about the profits and expenses of the business to the buyer. *See e.g., Paz, supra,* 36 Lehigh L.J. at 435.

■ However, "[g]enerally, neither buyer nor seller is under a duty to disclose material information in the absence of a positive misrepresentation or act of concealment." *Gordon v. Sokolow,* 434 Pa.Super. 208, 219, 642 A.2d 1096, 1101 (1994). Rather, a purchaser of a business is under a duty to investigate the financial condition of the business. Only a seller of a business who is guilty of deliberately defrauding or misrepresenting the financial condition of a business who is liable therefor. *See Paz, supra,* 36 Lehigh L.J. at 436. *See also Suraci v. Ball,* 160 Pa.Super. 349, 352, 51 A.2d 404, 406 (1947); *Ashland Towson Corp. v. Kasunic,* 110 Pa.Super. 496, 501, 168 A. 502, 503–04 (1933); and *Bross v. Home Supermarket Grocery Co.,* 32 D. & C.2d 75, 80 (Phia.Co.1962).

We also note that neither the Bill nor the Agreement contains any warranties. The Agreement, executed by the parties when the transaction was initially finalized, states as follows:

Entire Agreement and Amendment. This Agreement, and its exhibits contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby and they collectively supersede all prior or contemporaneous agreement, understandings, representations and warranties between the parties, and may note be amended except by written instrument executed by the parties hereto.

No provision requiring the Claimant to supply any further documentation, such as financial records, is included in the Agreement, or in the Bill, or in any other document admitted into the voluminous record.

As to the factual issue, the evidence shows that the Debtors engaged in very little due diligence prior to purchasing the Bakery. There is no indication that they obtained counsel in the transaction until after they had committed themselves to the purchase. There is also no indication that they fulfilled their responsibility to undertake a proper investigation of the books and records of the Bakery before they executed the Agreement to purchase it. Had they done so, they would have requested copies of the most recent tax returns of the Bakery, any and all financial statements, as well as an audit and/or review of the books and records of the Bakery and had them reviewed by a professional person *before* they committed themselves to the transaction. Mock's testimony indicates that the Debtors' accountant was available to them for such consultation, but that they rushed into an "impulse purchase" of the Bakery before allowing any such financial examination to take place. Although the Debtors now regret their haste, we note that there is no evidence to support the conclusion that the Claimant would not have provided them with the information that they requested before the purchase was finalized if they had given him an opportunity to do so. Instead, the Debtors chose to rely on what were clearly and admittedly informal financial calculations and guesstimates of the Claimant and his bookkeeper as to the monthly income and expenses of the Bakery.

We reiterate that we found that there is no indication that the Claimant was intentionally trying to defraud or mislead the Debtors. Being unsophisticated in such matters himself, we find that he not only gave them all of the information which they specifically requested, but also that he gave them all that he was capable of giving them in light of their haste to consummate the transaction. Thus, we find that the Claimant breached no duties to the Debtors in making his disclosures of the Bakery's financial condition to them.

Having determined that the Debtors failed to prove that the Claimant breached any general duty of disclosure to them in the Bakery sale transaction, we examine their allegations to attempt to ascertain whether any legal theory supports their recently-articulated claim for rescission of the sale. This search for legal theories is as far as we can go in providing a dispensation to *pro se* litigants, under the precepts articulated at pages 892–893 *supra.* The Debtors, although appearing *pro se,* had the duty of producing evidence to support their legal claims. *Id.*

One potential legal claim which the Debtors arguably allege, at least in their most recent brief, is a claim of fraudulent misrepresentation on the part of the Claimant. However, it is well-established that an action for fraudulent misrepresentation requires proof of the following elements: (1) a representation, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *See Michael v. Shiley, Inc.,* 46 F.3d 1316, 1333 (3d Cir.1995); *Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1142 (3d Cir.1993); *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 731 (3d Cir. 1991), citing *Scaife Co. v. Rockwell–Standard Corp.,* 446 Pa. 280, 285, 285 A.2d 451, 454 (1971); *Step–Saver Data Systems, Inc. v. Wyse Technology,* 939 F.2d 91, 106 (3d Cir. 1991); *Weisblatt v. Minnesota Mutual Life Ins. Co.,* 4 F.Supp.2d 371, 377 (E.D.Pa.1998); and *Heffler v. Joe Bells Auto Service,* 946 F.Supp. 348, 353 (E.D.Pa.1996). *Cf., e.g., In re Fulginiti,* 201 B.R. 730, 733 (Bankr.

E.D.Pa.1996) (referencing the similar elements of a claim for dischargeability based upon 11 U.S.C. § 523(a)(2)(A), involving debts obtained by false pretenses, false representations, or fraud of the debtor). Thus, "the initial inquiry for the judge is whether the proof of every element of fraud has met the exacting standard. ..." *Delahanty v. First Pa. Bank, N.A.,* 318 Pa.Super. 90, 110, 464 A.2d 1243, 1253 (1983). *Accord, Wittekamp, supra,* 991 F.2d at 1142. Moreover, the plaintiff in a fraudulent misrepresentation case bears a heavy burden in establishing *each* element of fraud by clear and convincing evidence. *See e.g., Weisblatt, supra,* 4 F.Supp.2d at 377.

▮▮▮ Another potential legal claim which the Debtors arguably assert appears to be the tort of negligent misrepresentation. The elements of this tort are as follows: (1) a misrepresentation of a material fact; (2) the representor either knows of the misrepresentation, makes the misrepresentation without knowledge as to its truth or falsity, or makes the representation under circumstances in which he ought to have known of its falsity; (3) the representor intends the representation to induce another to act on it; and (4) injury results to the party acting in justifiable reliance on the misrepresentation. *See Gibbs v. Ernst,* 538 Pa. 193, 210, 647 A.2d 882, 890 (1994). Thus, the only real difference between negligent misrepresentation and intentional misrepresentation is the intent of the party making the representations.

Finally, courts applying Pennsylvania law have opined that

> the law is clear that a purchaser cannot rely on a misrepresentation that should have been readily apparent from the information provided to him by the seller. Thus, a purchase is " 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.' "

*Wittekamp, supra,* 991 F.2d at 1145, citing *Bowman v. Meadow Ridge, Inc.,* 419 Pa.Super. 511, 518 n. 3 615 A.2d 755, 759 n. 3 (1992), quoting in turn RESTATEMENT (SECOND) OF TORTS, § 541, comment *a,*

at 89 (1977). *See also Scaife, supra,* 446 Pa. at 287, 285 A.2d at 455 (" 'A misrepresentation as to the subject of a proposed sale will not support an action for deceit if the subject be open to the buyer's observation,' ") quoting *Emery v. Third Nat'l Bank,* 308 Pa. 504, 511, 162 A. 281, 283 (1932).

▮▮ We find that the Debtors failed to meet their burden of proving, on this record, most of the elements of these torts by the requisite clear and convincing evidence standard, or, indeed, by even the less demanding preponderance of the evidence standard. As to the six fraudulent misrepresentation requirements, we can find that, through the witnesses called, the Debtors established only that the Claimant made certain representations regarding the financial condition of the Bakery to the Debtors. However, the absence of testimony from the Debtors, or any witnesses on their behalf, addressing any of the other elements renders any such claim totally unproven. There was no direct testimony regarding the second element of the materiality of these representations to the transaction. Indeed, the evidence supports the conclusion that the Debtors rushed into the sale transaction without insisting upon or awaiting receipt of any definitive financial information. There was no testimony at all regarding the fifth element, *i.e.,* the Debtors' reliance upon any alleged misrepresentations by the Claimant, justified or otherwise. Again, the sequence of events suggests that the Debtors made the decision to purchase the Bakery without relying heavily, if at all, on the information provided or not provided regarding the financial condition of the Bakery. Finally, the Debtors presented no evidence regarding their precise damages, and no evidence establishing that any such damages were proximately caused by the Claimant's misrepresentations.

Our factual findings rendered at pages 895–896 *supra,* reject any conclusion that the third or fourth elements were proven, either. We find that the Claimant pointed out the limitations in the accuracy of the financial data provided, and was not chargeable with either reckless nor knowingly false disclosure of material information. As a result, it is impossible for us to conclude that the Claim-

ant intentionally misled the Debtors regarding the Bakery's financial condition.

With respect to the elements of the tort of negligent misrepresentation, we began by observing that there is no evidence of any misrepresentation of a fact and, for the reasons stated two paragraphs *supra*, no showing that any inaccuracies in the information provided were material. We find that the element of the Claimant's inducing the Debtors to act on the basis of any inaccuracies has therefore not been proven. Finally, again, the Debtors produced no evidence which established their damages, or that any damages resulted from any sort of justifiable reliance on the Claimant's representations.

We therefore find that the elements of the torts of fraudulent or negligent misrepresentation on the part of the Claimant have not been proven by the Debtors. We therefore conclude that the Objections to the Claim are not supported by any cognizable substantive-law theories.

5. *The Debtors Have Proven No Basis to Support Rescission of the Bakery Purchase, and Certainly Not at this Late Juncture.*

In their final post-hearing brief, as referenced at pages 893–894 *supra*, the Debtors emphatically asserted a right to rescind the transaction in which they purchased the Bakery. However, "[r]escission amounts to the unmaking of a contract, and is not merely a termination of the rights and obligations of the parties towards each other, but is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract." *Keenheel v. Commonwealth, Pennsylvania Securities Comm'n*, 134 Pa.Cmwlth. 494, 501, 579 A.2d 1358, 1361 (1990), quoting *Metropolitan Property & Liability Ins. Co. v. Commonwealth*, 97 Pa.Cmwlth. 219, 222, 509 A.2d 1346, 1348 (1986), *aff'd*, 517 Pa. 218, 535 A.2d 588 (1987). The purpose of the remedy of equitable rescission is to return the parties to a contract to their original positions regarding the subject matter of the contract, or as close thereto as possible. *Keenheel, supra*, 134 Pa.Cmwlth. at 501, 579 A.2d at 1361. Thus, a party that wants to rescind a contract must return or restore the subject property or security to the other party to the contract. *Id.*; and *Fowler v. Meadow Brook Water Co.*, 208 Pa. 473, 476, 57 A. 959, 960 (1904).

Fraudulent inducement only makes a contract voidable, it does not void the contract. *In re Allegheny, Int'l, Inc.*, 954 F.2d 167, 178 (3d Cir.1992); and *Seal v. Riverside Federal Savings Bank*, 825 F.Supp. 686, 695 (E.D.Pa.1993). Thus, even if the Debtors had proven that the Claimant had fraudulently induced them to enter into the asset purchase agreement, which they have not, *see* pages 896–897 *supra*, such a finding would not have required this court to void that agreement.

If a party to a contract wants to rescind that contract on the basis of fraud or otherwise, that party must do so promptly, as soon as the fraud is discovered. *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments*, 951 F.2d 1399, 1408 (3d Cir.1991); *Seal, supra*, 825 F.Supp. at 697; and *Levin v. Garfinkle*, 492 F.Supp. 781, 807 (E.D.Pa.1980), *aff'd*, 667 F.2d 381 (3d Cir.1981). Thus, courts have denied rescission of a contract when there has been considerable delay and a pattern of behavior which is inconsistent with the disaffirmance of the contract. *Seal, supra*, 825 F.Supp. at 697; and *Sixsmith v. Martsolf*, 413 Pa. 150, 152, 196 A.2d 662, 663 (1964) ("action designed to rescind a contract secured by fraud properly dismissed for failure to state a claim because that action—instituted more than twenty-five months after completion of the transaction described in the contract—was 'legally too late for this purpose.'"). When a party has been fraudulently induced to enter into a contract, that party has two choices of remedies: rescind the contract or affirm the contract and sue the breaching party for monetary damages. *Mellon, supra*, 951 F.2d at 1408; *Associated Hardware Supply Co. v. Big Wheel Distributing Co.*, 355 F.2d 114, 120 (3d Cir.1965); and *Nadolny v. Scoratow*, 412 Pa. 488, 491 n. 4, 195 A.2d 87, 89 n. 4 (1963). It is the law in Pennsylvania that

a party cannot continue to perform under the contract and later be heard to say that

the other party breached the agreement prior to the continued performance, and, therefore, no contract existed. By electing to continue its performance, [the non-breaching party] ... remains bound by the terms of the contact. Its only remedy for [the breaching party's] ... alleged breaches of the contract is a claim for monetary damages.

*Fuller Co. v. Brown Minneapolis Tank & Fabricating Co.,* 678 F.Supp. 506, 509–10 (E.D.Pa.1987).

Our discussion at pages 895–898 *supra* establishes that the Debtors had no substantive basis supporting any relief including that of rescission of the contract to purchase the Bakery from the Claimant. However, assuming *arguendo* that they had presented evidence supporting a tort claim, we hold that, due to their delay in requesting same, the Debtors would not be entitled to the remedy of rescission in any event. There is no evidence that the Debtors acted to rescind the Bakery purchase immediately upon discovering what they allege was fraud or misrepresentations on the part of the Claimant. Indeed, the Debtors' prayer for rescission did not emerge until they filed their most recent post-hearing brief in this court over two-and-a-half years after the Bakery was closed. Thus, even if cause to rescind were proven, it would be inappropriate to grant that relief at this point.

In an effort to assist the parties, principally the Debtors *pro se* status, we cited two cases to the parties at the close of the hearing of July 30, 1998, in which the purchasers succeeded in rescinding sale contracts due to fraudulent misrepresentations on the part of sellers, *Brown v. Hassenstab,* 212 Or. 246, 319 P.2d 929 (1957); and *Paz, supra.* Perhaps the Debtors obtained the idea to seek rescission from review of these cases. However, a comparison of the facts proven in the those cases to the facts proven in the instant matter well exemplifies the basis for a different result here.

In *Brown* the income of the theatre business at issue was advertised by the sellers. 212 Or. at 248, 319 P.2d at 930. The representations advertised and reiterated by the sellers were clearly false. 212 Or. at 253, 319

P.2d at 933. Within a year from the sale transaction, the purchasers tendered all property transferred back to the sellers. 212 Or. at 253, 319 P.2d at 932.

In *Paz* the seller of a coin-operated laundromat admitted, upon the purchasers' rescission attempt seven months after the purchase, that the business, contrary to his pre-purchase representations, "had been a 'lemon' and that that was why he got rid of it." 36 Lehigh L.J. at 433. In addition to proving that the specific figures represented by the seller was false, *id.* at 435–36, and that the plaintiff promptly sought the remedy of rescission, the *Paz* case therefore featured a virtual admission by the seller that he had defrauded the buyer.

The instant facts are quite distinct. No fraud nor misrepresentation on the part of the Claimant was admitted nor proven, and the attempted rescission was clearly a belated afterthought. The Debtors are therefore not entitled to rescission nor any other relief from the Claim asserted by the Claimant.

6. *The Claim Will Be Fixed at $60,-838.65; and This Long–Outstanding Case Must Proceed Forthwith to Confirmation.*

In its most recent brief, the Claimant gratuitously asserts that the Claim should be reduced to $60,838.65 from the $63,157.74 figure stated in his initial proofs of claim. The Debtors have not made any complaints regarding the specific amount or calculation of the Claim. The best that we can conclude in their interests is to utilize the lower $60,-838.65 figure and adhere to the Claimant's classification of the claim as unsecured. This classification allows the Debtors some considerable leeway in proposing the treatment of this claim in their plan. They may treat it as only a general unsecured claim, which must not, for that reason, be paid in full in the plan to achieve confirmation.

We note that, on July 1, 1998, the Claimant filed a series of Objections to the Debtors' most recent plan. While the plan-confirmation process is not yet before us, and our following statements regarding the possible merit of these objections is preliminary only,

we deem it appropriate to make these remarks as guidance to the *pro se* Debtors in what we will direct will be a final effort to achieve confirmation of a Chapter 13 plan or have this case dismissed. We will thus allow the Debtors one further opportunity to amend their plan, but we do not expect to allow them any further dispensations, as this case is now over two years old. *See In re MacDonald*, 222 B.R. 69, 77–78 (Bankr. E.D.Pa.1998) (debtors given only one additional chance to amend their plan in a case that was 7½ months old). *Compare In re Hadley*, 1994 WL 96969, at *6 *7 (Bankr. E.D.Pa. March 23, 1994) (case of *pro se* debtors which was about 20 months old, due to prior conversions of the case from one Chapter to another, was dismissed without any opportunity for further amendments because of the long pendency of that case).

The alleged violations of 11 U.S.C. §§ 1322(a)(2), (a)(3) and (b)(8) referenced in the objections appear to have merit. The Debtors should be easily able to amend their plan to correct these deficiencies. The Debtors will also be obliged to amend at least their Schedules "I" and "J," and they should carefully assess their current budget to determine whether they have satisfied 11 U.S.C. § 1325(b)(1)(B). *See MacDonald, supra*, 222 B.R. at 73–75.

An alleged violation of 11 U.S.C. § 1325(a)(4) has previously been voiced by the Claimant during the proceedings on July 30, 1998, and may have merit. If the Debtors have non-exempt equity in the Home, the entire amount of that equity must be devoted to plan payments, or § 1325(a)(4) would preclude confirmation. The Schedules, as presently written, support the conclusion that they *do* have considerable non-exempt equity of $86,400 in the Home. However, we note that NNB was granted relief from the automatic stay to foreclose on the Home on June 17, 1998. The foreclosure of this equity would eliminate it. However, we suspect that no foreclosure has occurred and that the Debtors continue to aspire to retain the Home.

The final objections to confirmation, raised under 11 U.S.C. §§ 1322(a)(1) and (a)(3), are too vague and generalized to assess at this juncture.

## D. CONCLUSION

An Order implementing the within decision will be entered.

## ORDER

AND NOW, this 27th day of August, 1998, after colloquies and hearings of July 30, 1998, with interested parties and counsel relating to the Debtors' objections ("the Objections") to the proofs of claim filed by Eugene Fritzinger or related entities filed as Claim Nos. 4, 7, and 8 (collectively, "the Claim"), incorporating by agreement of the parties the record made before Judge Twardowski of this court on December 4, 1997, and January 28, 1998, and the submissions by the parties subsequent to the hearings as set forth in our Order of July 31, 1998, it is hereby ORDERED AND DECREED as follows:

1. The Objections are OVERRULED in most respects, as reflected in the within Opinion.

2. The Claim is allowed as a single unsecured claim in the amount of $60,838.65.

3. The Debtors shall resolve all outstanding impediments to confirmation, by filing and serving any necessary amended plan and any amended Schedules, specifically Schedules "I" and "J" and possibly Schedules "A" and "C," in all respects consistent with this Opinion, as well as making any other filings necessary to achieve confirmation, on or before September 14, 1998, or this case will be dismissed.

4. Any interested party shall file and serve any objections to any amended plan filed on or before October 9, 1998. Objections filed and served thereafter will not be considered.

5. A final hearing to consider confirmation of any amended plan and dismissal of this case is scheduled on

THURSDAY, OCTOBER 13, 1998, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

5.  No continuances of the aforementioned confirmation hearing will be permitted, and this case will most probably be dismissed on October 13, 1998, if a plan cannot be confirmed on that date, the only exception being a further brief continuance to effect technical amendments to the plan.