**In re Ralph D. BRILL, Debtor.**

No. 02–37138(cgm).

United States Bankruptcy Court,
S.D. New York,
Poughkeepsie Division.

Dec. 16, 2004.

———

Joann Sternheimmer, Deily, Mooney & Glastetter, LLP, Albany, NY, Attorney for Chapter 7 Trustee Paul Banner.

Peter Brill, Boston, MA, creditor pro se.

MEMORANDUM DECISION

CECELIA MORRIS, Bankruptcy Judge.

On October 19, 2004, the Court heard oral argument on the Trustee's Motion for an Order Reducing, Expunging and/or Modifying Claims and Creditor Peter Brill's Opposition thereto. On November 12, 2004 and November 22, 2004, respectively, counsel for the Trustee and the creditor *pro se* filed responsive briefs. For the reasons set forth below, the Court finds Creditor Peter Brill's Proof of Claim unenforceable against the estate because it is time barred pursuant New York Civil Practice Law and Rules Section 213, and thus disallows the claim pursuant to 11 U.S.C. §§ 502(b)(1) and 558.

### *JURISDICTION*

The Court has jurisdiction over this contested matter under 28 U.S.C. Sections 1334(a) and 157(a) and the standing order of reference to bankruptcy judges dated July 10, 1984 signed by acting Chief Judge Robert J. Ward. This is a core proceeding under 28 U.S.C. Section 157(b)(2)(B). The following opinion constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rules 9014 and 7052.

### *BACKGROUND FACTS*

On April 10, 1991 Debtor executed a Promissory Note (the "Note") in favor of his brother, Peter Brill (the "Creditor") in the principal amount of $100,000 bearing interest at a rate of ten percent (10%) per year. The Note provided that all payments due pursuant to its terms were to be made on or before April 9, 1992. Except for two interest payments of $10,000 each made on January 10, 1993 and January 26, 1996, Debtor has made no payments toward the Note. It is undisputed that the Creditor Peter Brill, Debtor's brother, never took legal action to collect on the Note prior to Debtor's bankruptcy filing.

On September 9, 2002 Debtor filed a voluntary petition pursuant to Chapter 7 of title 11 of the United States Code. Debtor listed the Creditor on his petition as holding an unsecured claim in the sum of $192,000. On November 15, 2002, the Creditor filed a Proof of Claim, Claim No. 3, asserting an unsecured claim in the original principal amount of $100,000, plus interest of $131,731.15, for a total claim of $231,731.15. Although both brothers state that a copy of the Note was attached to the filed Proof of Claim, no such Note is found on this Court's electronic docket. A hard copy of the Note was submitted to the Court by the attorney for the Trustee. On July 26, 2004 the Trustee filed a Motion Seeking an Order Reducing, Expunging and/or Modifying Claims, (the "Motion"), ECF Docket No. 126, seeking, *inter alia,* to expunge the Creditor's claim as not being supported by sufficient documentary evidence. Debtor objected to the Motion on the grounds that the Trustee was in possession of the signed promissory note, that the debt had been listed in the Debtor's bankruptcy petition,[1] that Credi-

---

1. The listing of a debt on a bankruptcy petition does not constitute written acknowledg- ment of the debt with the intent to pay so as to remove the Statute of Limitations as a bar

tor had testified as to the existence of the debt in Debtor's matrimonial trial and that the debt had been adjudicated Debtor's responsibility in the matrimonial proceeding. Meanwhile, the Trustee was communicating with the Creditor in an attempt to obtain supporting documentation to substantiate Creditor's claim, and the Creditor complied by forwarding the Note as well as various correspondence between the parties that reference the debt. On August 25, 2004, the Trustee requested an adjournment of the hearing on the Motion until October 5, 2004, stating in correspondence to the Court, ECF Docket No. 137, that documentation provided by the Creditor had supplied the Trustee with additional grounds to object to Creditor's claim. The Motion was also adjourned to allow the Creditor to obtain counsel to defend his claim, if the Creditor determined that was necessary. The Trustee submitted a Supplemental Affidavit In Further Support of the Motion for an Order Reducing, Expunging and/or Modifying Claims. The Court subsequently adjourned the October 5, 2004 hearing until October 19, 2004. On that date, the Creditor appeared in Court and submitted opposition to the Trustee's Motion, ECF Docket No. 143. After hearing oral argument and taking testimony, the Court took the matter under advisement. Subsequent to oral argument, both the Trustee and Creditor were permitted to file responsive briefs, ECF Docket Nos. 145 and 146, respectively.[2]

## SUMMARY OF THE ARGUMENTS

In the Trustee's Supplemental Affidavit and Memorandum of Law in Further Support of the Motion, the Trustee argues that Creditor's claim is barred on statute of limitation grounds, as the Note was due in full on April 9, 1992, and no action to collect on the loan was ever taken within the six-year limitation period. Additionally, no payment on the loan had been made since January 26, 1996, and thus, the statute of limitation expired at the latest on January 26, 2002,[3] approximately nine months before Debtor's bankruptcy filing. As the Creditor's claim would have been unenforceable against the debtor under applicable New York State Law, i.e. New York Civil Practice Law and Rules ("C.P.L.R.") § 213, the Trustee advances that the claim should be disallowed pursuant to 11 U.S.C. § 502(b)(1). Although the statute of limitation could have been ex-

to recovery. *See Erlichman v. Ventura*, 271 A.D.2d 482, 706 N.Y.S.2d 907 (2d Dep't 2000).

2. The Debtor has submitted to the Court a letter, dated November 22, 2004, with regard to the Trustee's Second Supplemental Memorandum. The letter at issue primarily discusses the matrimonial court's distribution of marital property, which was recently upheld by the First Department in an opinion authored by Judge George Marlow. The Debtor has expressed his intention to appeal the Appellate Division's affirmance of the property award; in any event, the outcome of that appeal will have no bearing on the disposition of this contested matter.

3. The Court assumes without deciding that partial payment made on January 26, 1996 extended the statute of limitation. In order to revive a statute of limitations, partial payment must be made "under circumstances from which a promise to honor the obligation may be inferred ... [to] ... make the time limited for bringing an action start anew from the time of such payment ..." *See Roth v. Michelson*, 55 N.Y.2d 278, 281, 449 N.Y.S.2d 159, 434 N.E.2d 228 (1982). The creditor has by no means definitively proven that the part payment made in 1996 revived the limitation period because he has not shown that the payment was made under circumstances from which a promise to honor the entire obligation may be inferred. The Trustee has proceeded, however, as if the January 26, 1996 payment revived the statute of limitation and thus the Court does not pass upon that issue herein.

tended by partial payment of the obligation or a written and signed acknowledgement of the debt containing nothing inconsistent with an intention to repay, *see* N.Y. General Obligations Law ("G.O.L.") § 17–101, the Trustee states that the correspondence between the Creditor and Debtor fails to meet the standard for reviving the applicable statute of limitation. The Creditor counters the Trustee's arguments by supplying the Court with correspondence between the parties, as well as the Net Worth Statement prepared by Debtor in 1999 in connection with his matrimonial action, all of which the Creditor contends satisfy the standard for reviving the statute of limitation pursuant to applicable New York law. Both parties filed response briefs that contradict their opponent's arguments but did not advance any new positions.[4]

### DISCUSSION

■ A challenged claim will not be allowed by the bankruptcy court if the claim is barred by the applicable statute of limitations. Pursuant to 11 U.S.C. § 502, a claim, proof of which has been filed, is deemed allowed unless objected to and, after notice and a hearing, the court disallows the claim in whole or in part. Section 502(b)(1) requires a claim to be disallowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." Further sup-

port for disallowing a time barred claim is found in 11 U.S.C. § 558 which provides that "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation ... A waiver of any such defense by the debtor after the commencement of the case does not bind the estate." The Southern District of New York recognizes the authority of the Bankruptcy Court to apply a statute of limitation or other dispositive defense in the disallowance of claims. *See In re U.S. Lines, Inc. v. U.S. Lines Reorganization Trust,* 262 B.R. 223, 234 (S.D.N.Y.2001); *see also G.W. White & Son, Inc. v. Tripp,* 1995 WL 65058 at *2 (N.D.N.Y.1995) (if a claim would be unenforceable against the debtor outside of bankruptcy because the statute of limitation had run, the claim will not be allowed in bankruptcy); *cf. In re Cutler–Owens Int'l Ltd.,* 55 B.R. 291, 292–3 (Bankr.S.D.N.Y.1985).

■ New York C.P.L.R. § 213 provides that an action to collect sums due under a note must be commenced within six years. The statute of limitation applicable to an action on a note accrues on the date final payment became due on the subject debt. *See Young v. Woodcrest Club,* 188 Misc.2d 706, 729 N.Y.S.2d 855, 857 (N.Y.Sup.Ct. 2001) (the right of action does not accrue upon a contract until payment thereunder is due by its terms); *Anthony Marino Constr. Corp. v. F. & J. Sales Corp.,* 76 A.D.2d 767, 429 N.Y.S.2d 417 (N.Y.App.

---

4. The creditor refers to settlement discussions with the Trustee in his Response to the Trustee's Second Supplemental Memorandum of Law to the Trustee's Motion. The creditor states that settlement negotiations are an "obvious admission that there is merit to the Claim." Federal Rule of Evidence 408, Compromise and Offers to Compromise, states that "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable con-

sideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, *is not admissible to prove liability for or invalidity of the claim or its amount.* Evidence of conduct or statements made in compromise negotiations is likewise not admissible." Therefore, the Court has disregarded the creditor's reference to settlement negotiations in rendering this opinion.

Div.1980) (Limitations period to recover on note began to run on the repayment date of the loan). The parties agree that pursuant to the terms of the Note, payment in full was due on April 9, 1992. The Creditor does not dispute that the six-year statute of limitations found in C.P.L.R. § 213 applies to his claim, and that absent any revival or extension of the pertinent limitation period, his claim would be time barred and unenforceable against the bankruptcy estate.

▮ The only issue in dispute is whether G.O.L. Section 17–101 extended the six year limitation period in the instant case. G.O.L. Section 17–101 states in pertinent part that "[a]n acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules ..." In order to revive the statute of limitations, "the writing ... to constitute an acknowledgment, must recognize an existing debt and **must contain nothing inconsistent with an intention on the part of the debtor to pay it."** *See Lew Morris Demolition Co. v. Bd. Of Educ. of City of New York*, 40 N.Y.2d 516, 521, 387 N.Y.S.2d 409, 355 N.E.2d 369 (1976)(emphasis added); *GP Hemisphere Assoc., LLC v. Republic of Nicaragua*, 2000 WL 1457025 (S.D.N.Y. Sept.28, 2000); *Banco do Brasil v. State of Antigua*, 268 A.D.2d 75, 707 N.Y.S.2d 151 (N.Y.App.Div.2000). "In determining the effectiveness of an acknowledgment, the critical determination is whether the acknowledgment imports an intention to pay." *Knoll v. Datek Secs. Corp.*, 2 A.D.3d 594, 769 N.Y.S.2d 581 (N.Y.App.Div.2003). Additionally, the acknowledgment of the existing debt and the intent to pay same must be unconditional. If any condition must be satisfied prior to payment being made, such as the future ability to pay or the sale of an asset, the Creditor must show that the condition has been satisfied before application of the toll contained in G.O.L. § 17–101. *See Snyder v. Madera Broadcasting, Inc.*, 872 F.Supp. 1191, 1198 (E.D.N.Y.1995); *see also Flynn v. Flynn*, 175 A.D.2d 51, 572 N.Y.S.2d 307, 309 (N.Y.App.Div.1991); *Mesiano v. Mazzeo*, 12 Misc.2d 858, 172 N.Y.S.2d 913 (N.Y.Sup.Ct.1958) (If borrowers acknowledgment and promise to pay is one to repay when he is able to do so, the lender must plead and prove such ability); *Eppler v. Van Vleck*, 16 N.Y.S.2d 809, 810 (N.Y.Sup.App.Term 1939) ("None of the letters sent by the defendant to the plaintiff was unconditional. Those sent within six years after the debt became due acknowledged the debt, but promised payment only when able ... the plaintiff had the burden of establishing ability to pay on the part of the defendant"). The parties agree that this is the legal standard to be satisfied; however, the Trustee and the Creditor draw different conclusions based on the Debtor's letters to his brother with regard to the subject loan. For the reasons set forth below, the Court holds that each correspondence that contains an acknowledgment of the debt either contains a condition that has not been satisfied or a statement inconsistent with an intention to repay such that the toll contained in G.O.L. § 17–101 does not apply.

### The Letters

▮ The Creditor provided the Trustee and the Court with several communications [5] which he advances acknowledge the

---

**5.** The creditor submitted the first page of one letter, dated November 17, 1998, which acknowledges the debt and references allocation of responsibility for the debt to either Debtor

claim such that the limitation period was tolled. In considering each letter, the Court first ascertains whether the debt has been acknowledged, and then determines whether any inconsistencies or conditions are placed on payment. Of course, the existence of any such inconsistencies or conditions would mean that the letter would not meet the standard for extending the six-year limitation period.

**Letter dated September 24, 1996:**

| | |
|---|---|
| Acknowledgment of Debt: | "I will still no matter what happens give your money back." |
| Statements Inconsistent with Intention to Pay or Conditions on Payment: | "Our financial condition continues to deteriorate as the IRS is taking away all of Gail's new income and I remain treading in hot water . . . it is not clear what will be left, if anything . . . As for me, I am broke. I have assets but no cash . . . I am at the edge. If a buy out happens [of water purification technology] the cash to me will hopefully be enough to pay you off and others . . . If the Culligan Deal doesn't happen I will be in trouble . . . So let's confront the next 24 months realistically concerning your $100,000 . . . I will not have enough money to make any '96 Interest Payments or Principal Reduction payments. The earliest will be June '97 counting on Culligan, Gail, or Colorado Land Sales . . . What I need now is another $100,000. Our credit is so bad that the banks won't loan to us for a few years . . . Cash or your signature to borrow $100,000 was what I would explore . . ." |

The Debtor's statement, "I will still no matter what happens give your money back," was made in connection with a request for additional funds. The Debtor continuously references his dire financial straits and conditions payment to the Creditor on the success of his various business ventures and a future ability to pay. At no point does Debtor propose a payment plan, or make any concrete unconditional proposal to repay the money owed to the Creditor. Instead, he states that he will be unable to pay anything unless the "Culligan deal" is consummated, the Colorado Land Sales are successful, or "Gail" [Debtor's former spouse] is able to somehow repay the loan. The Creditor has not shown any of these conditions have been satisfied, i.e. that the Culligan deal occurred. *See Flynn v. Flynn,* 175 A.D.2d 51, 572 N.Y.S.2d 307 (1st Dep't 1991); *Snyder v. Madera Broadcasting, Inc.,* 872 F.Supp. 1191, 1198 (E.D.N.Y.1995) (while an express promise to pay is conditioned on the happening on some future ability or debt, the burden is on the Creditor to show fulfillment of such condition, and absent such showing, application of section 17–101 is inappropriate). The Creditor does not allege or prove that Debtor became able to

or his estranged wife in the matrimonial proceeding. As this correspondence does not meet the signature requirement of G.O.L. Section 17–101, and additional information may have been contained on subsequent pages that have not been provided to the Court, the Court does not consider this letter in connection with this decision.

pay at any time, or that any of the Debtor's undertakings were profitable.[6] This letter therefore fails to meet the standard set forth in G.O.L. § 17–101.

**Letter dated April 16, 1998:**

| | |
|---|---|
| Acknowledgment of Debt: | "In that troubled year you were good enough to loan us $125,000 [7] ... I am taking responsibility for your loan ... I figured we owe you $150,000." |
| Statements Inconsistent with Intention to Pay or Conditions on Payment: | "We have gotten ourselves into a financial straightjacket. Some of these problems our own doing, but the big reasons why you ... haven't been paid has to do with market conditions and events beyond our control like my $87,000 hospital bill ... all together we owe over $4,000,000 ... So as the saying goes you can't take money out of a stone—and that's where we are. If we had it or could get more of it you are the first in line for some more payments ... I have stated this before—if I knew that you would need those funds I wouldn't have approached you and if we knew how our world was going to unfold I wouldn't have made that fateful request of you in 1991.... We have no funds to pay you at this time ... However, if the stock market was making me richer by the week and I didn't need the money right away I'd probably cast this loan as a safe treasury bond that might take a while to redeem or mature but will prove to be a satisfactory investment in the long run ... Another idea is for you to put some money into the River's Edge Colorado Project to get it going and give yourself a new project to work on. This will get you a return on your new money and there is enough profit to return what I owe you as well. The same would be true about the Deer Hollow Project in Cold Spring ... I'm not sure where the $8,275.49 comes from but I am glad to pay it if it is due." |

Again, Debtor emphasizes his financial difficulties, states that the Creditor "can't

---

**6.** Pro se litigants are afforded considerable leniency in meeting formal pleading requirements. Nonetheless, pro se litigants are not relieved of their duty to plead and prove their entitlement to the relief they seek. *See De-Buono v. Fanelli (In re Fanelli)*, 263 B.R. 50,62 (Bankr.N.D.N.Y.2001) (Gerling, J.) (While obligated to hold pro se litigant to a more relaxed procedural standard, the Court would not ferret out arguments on his behalf and seek to substantiate them when no attempt is made to so by the litigant); *In re*

*Wright*, 223 B.R. 886, 893 (Bankr.E.D.Pa. 1998) (pro se litigants are held to the same standard as represented litigants when it comes to proving their positions).

**7.** Note that Debtor states that he paid back a separate $25,000 loan, plus interest, in his 4/16/1998 letter. The $25,000 loan is not at issue in the bankruptcy as it has been satisfied.

take money from a stone" and asserts that he has no funds to repay the Creditor. Debtor also requests more funds from the Creditor and states that repayment will be forthcoming *if* the Creditor lends the Debtor additional money. His vague references to repayment at an unknown and unascertainable date in the future strike the Court as an attempt to induce the Creditor to invest in yet another of Debtor's business ventures, rather than an expression of an intention to repay the sums due. The Debtor's statements that he is currently unable to make payments and does not know when he will be able to make any payments is inconsistent with an intention to repay the loan and thus, the April 16, 1998 letter does not extend the applicable statute of limitation.

**Letter dated June 8, 1998:**

| | |
|---|---|
| Acknowledgment of the Debt: | "I am deeply frustrated that I have not repaid you what you were so kind to provide to us by now ... we are very sorry to have taken your well intentioned funds. To have dragged this out so long was not our plan or purpose." |
| Statements Inconsistent with Intention to Pay or Conditions on Payment: | "In my heart and on paper you were to have gotten all your money back at the time the Log Home was sold in Telluride ... Unfortunately it took much longer to sell because the economy was in recession. When we finally did sell it was sold for $1,000,000 on 100 acres—which was all of our holdings. We were planning to get $200,000 for the additional 35 acres ... I never recovered. I didn't plan it that way or misinform you of our inability to pay! ... These properties have high mortgages on them. I have to sell them at prices sufficiently above the mortgages to make it worth while ... there are tax liens and bank obligations which would be taken off first by the title companies before anything is left over to pay you.... I'm not sure what you mean by passing ownership to you [in response to Creditor's suggestion made in May, 1998 that Debtor pass ownership of a property to him to satisfy the debt]. Everything that has a lien on it has to be satisfied before passing title ... *if I* can get rid [of a partner] on the Cold Spring land *it might be possible* to carve out something for you there of approximate value. *If I had the ability to get any of our holdings free and clear that would mean I'd have the money to pay you which I don't have and isn't possible at this time* ... *if* you could invest about $100,000 through your own corporation into the Colorado Project you would have a new project ... Another way is for me to borrow the money from a bank or your margin account with your signature guarantee so no monies have to leave your account ... *If* I can get a couple Lots |

> developed in Colorado this Project would begin to Sell and *I believe* very strongly that your funds would be returned to you plus an additional kicker."

Again, the Debtor declines to make payment, and even refuses to pass title of a property to the Creditor to satisfy the underlying loan. Debtor states in his letter that all mortgages must be satisfied to transfer such title and that payment to the Creditor was not possible at the time; instead, Debtor again attempts to induce the Creditor to lend him more money. Repayment to the Creditor is always conditioned upon some future fortuitous event dependent upon additional sums being lent by the Creditor. At no point does the Debtor offer unconditional payment at a specific point in time.

Interestingly enough, the Creditor himself apparently did not believe that the Debtor's many promises were consistent with an intention to repay him. In an email to the Creditor dated August 13, 2001 Debtor mentions the "big loan" and asks for a loan of additional sums. Once again, Debtor refers to the debt as a bond that the Creditor cannot access until it is mature. The Creditor replies by ridiculing the Debtor's characterization of the loan as a bond, which he refers to as a "Brill Bond." The Creditor refused to lend additional money to Debtor because he did not believe that Debtor would repay any funds, stating that there was "no guarantee [of payment] and poor history." The Creditor points out that Debtor has never even offered a payment plan on the loan, despite Creditor's numerous requests that he do so. The Creditor goes on to underscore that Debtor's only offers of repayment have been conditioned on participation in Debtor's "investments," which

the Creditor placed in single quotation marks, indicating to the Court that he does not himself believe that Debtor's offers provide a realistic opportunity for return or evidence an intention to repay the money owing. The email at issue was sent pre-petition and reflects the Creditor's understandable frustration as well as his obvious belief that Debtor had no intention whatsoever of repaying the funds owed. The Creditor further indicates, in an email entitled "Cornered," and dated August 12, 2001 [8] that "A Bank or another Creditor would have foreclosed by now. Should I have sent you weekly bills & (sic) made daily threatening demand calls? It seems you have a weak sense of obligation and *no intention of repaying me, but prefer to expend whatever spare change you might have at the moment on personal/family gratification/obligation* rather than make any payments (however slight) on the loan ..."

Like the Creditor, the Court now reaches the inescapable conclusion that Debtor never intended to repay the debt owed to Creditor, the letters forwarded to the Creditor which acknowledge the loan were in fact thinly veiled attempts to borrow additional funds and contained conditions upon repayment that were never fulfilled as well as statements inconsistent with an intention to repay. Furthermore, it is also clear that the Creditor refrained from pursuing legal remedies based upon a sense of familial obligation.[9] While understandable, this forbearance is not a legally sufficient reason to prejudice Debtor's other creditors, who have acted to preserve their

---

8. The date is handwritten in the email header.

9. No such filial sensibility prevented the Creditor from charging his brother a handsome interest rate of 10% per annum.

legal rights. Whereas Creditor declined to collect from his brother, he has no similar scruple against seeking payment from the bankruptcy estate, thereby reducing the dividend to other creditors who have been diligent in pursuing their claims. These creditors, who went to the expense of reducing their claims to judgment or instituting legal proceedings, should not now be prejudiced by payment of a time barred claim.

"Statutes of limitation are designed, in part, to protect potential defendants from the burden of litigating stale claims by putting defendants on notice of claims against them within specified periods, so they can prepare their defenses adequately while the evidence is still fresh. They are designed to prevent fraudulent and stale claims from being asserted, to the surprise of the parties or their representatives, when the evidence has been lost, or the facts have become obscure from the lapse of time or the defective memory, death, or removal of witnesses." *See* 51 Am.Jur.2d *Limitation of Actions* § 15 (2004).

It is true that application of a statute of limitation can have rigid and sometimes harsh results. The need for finality necessitates this rigidity. Legislatures have set deadlines upon the ability to seek recourse from the courts to prevent defendants from being held liable in perpetuity for past actions when memories have faded, evidence has been lost or has degraded, and witnesses are no longer available to testify. The claim being asserted in this case is stale. The defendant is no longer the Debtor personally, but his bankruptcy estate. The estate now has the burden of challenging the legitimacy of debt that is more than a decade old. Other creditors in this action might be surprised to learn that Debtor owes his brother close to a quarter of a million dollars, as there is no suggestion that the promissory note was

ever recorded in any public record, or any legal action ever instituted against Debtor.

### The Net Worth Statement

■■■■ The Creditor's argument that that statute of limitation was revived by Debtor's inclusion of his debt on Debtor's February 16, 1999 Net Worth Statement (the "Net Worth Statement") need not occupy the Court for very long. Case law states that an acknowledgment of a debt to a third party will be effective to revive the limitation period if it appears that the debtor's intention was to communicate the acknowledgment to the creditor. *See, e.g. Clarkson Co. v. Shaheen,* 533 F.Supp. 905, 932 (S.D.N.Y.1982)(carrying debt on books for two years and acknowledging debt in annual report revived statute of limitation pursuant to G.O.L. Section 17–101); *Vengroski v. Garden Inn,* 114 A.D.2d 927, 495 N.Y.S.2d 200 (N.Y.App.Div.1985) (the mere fact that the debt was carried on defendant's books and tax returns would not in and of itself constitute the required acknowledgment; critical determination is whether the acknowledgment imports an intention to pay). The Creditor argues that the Debtor forwarded the Net Worth Statement to him via letter dated June 14, 1999, thereby communicating an intention to repay the debt. The only on-point case cited by Creditor in his first reply brief, *Flynn v. Flynn,* 175 A.D.2d 51, 572 N.Y.S.2d 307, 309 (N.Y.App.Div.1991), states that a Net Worth Statement is not a written acknowledgment addressed to defendant-creditor and therefore is insufficient to start a statute of limitation running again. Additionally, although the Creditor states that the Net Worth Statement was provided to him under cover of a letter dated June 14, 1999, the letter itself makes no mention of enclosing the Net Worth Statement, or what conclusion Creditor should draw from such an enclosure. Although the Creditor argued be-

fore this Court that it was the Debtor's habit to enclose documents with his communications without making any mention of the enclosures, this testimony is belied by the fact that the June 14, 1999 letter *does* mention an enclosure—a promotion on Architectural Tours of Europe. Thus the Court is not convinced that the Net Worth Statement was forwarded to the Creditor with that letter. Additionally, in order to satisfy the Court that the third party acknowledgment standard had been satisfied, the Debtor in this circumstance would have had to make mention of the Net Worth Statement in the body of the letter, with an indication as to why the Net Worth Statement was enclosed—i.e. that Creditor would be paid through the matrimonial proceeding. "When the debtor acknowledges the existence of the debt to a stranger, the acknowledgment will be effective *if it appears that it was the intention of the debtor* that the acknowledgment should be communicated to and should influence the creditor. Where, however, there is no intention on the part of the debtor that his statement be communicated to the creditor, the acknowledgment is not sufficient to stop the running of the statute." *In re Sonnenthal,* 39 Misc.2d 901, 242 N.Y.S.2d 135 (N.Y. Surrogate Ct.1963)(emphasis added). Where, as here, the parties are brothers, with an incentive to assist one another as against other creditors of the estate, the Court requires more than mere testimony of the claimant and the Debtor as to the transmittal of the Net Worth Statement and the intent behind same—instead, contemporaneous evidence of the communication and its intent would be essential.

There are other difficulties with the Net Worth Statement's alleged acknowledgment of the debt—it provides 1990 as the year the debt was incurred, when in fact the subject Note was signed in 1991. The Net Worth Statement also lumps together the two separate loans made pursuant to two separate instruments—the $100,000 and $25,000—as if borrowed pursuant to the same instrument, under the section entitled "Notes [**plural**] Payable." Ostensibly, these should have been listed as separate obligations, and indeed, the $25,000 note should not have been mentioned at all, as the smaller loan was purportedly repaid almost immediately, *see* Letter to Peter Brill, dated April 16, 1998 ("A minor point, but simultaneously with this loan was a loan for $25,000 and you did receive that principal plus interest back . . .".). These minor discrepancies would not be so troubling if the Net Worth Statement did not contain a legend above Debtor's notarized signature which states "The foregoing statements . . . have been carefully read by the undersigned who states that they are true and correct." As Debtor affirmed that he had carefully read the Net Worth Statement for inaccuracies, the Court must assume that the 1990 date was accurate and that Debtor may be referring to a different debt owed to the Creditor altogether. In any case, the debt is not identified with sufficient precision in the Net Worth Statement to absolutely constitute an acknowledgment of the claim at issue herein, as there are discrepancies as to date and amount.

The Court is not persuaded on the current record that this Net Worth Statement was communicated to the Creditor as Debtor's intention to repay him; rather, it is just as likely the debt was included for consideration by the state court in the equitable distribution analysis. There is no indication in the June 1999 letter that Debtor intended to repay the Creditor after the matrimonial proceeding was complete, if a property award was made on that basis. Indeed, why should he? There was never a threat of any legal

action; Debtor was confident of Creditor's forbearance based upon past experience.

### CONCLUSION

The Creditor's claim is disallowed as barred by the applicable statute of limitation. The Trustee is directed to submit an order consistent with this opinion.